# MISSOURI, KANSAS AND TEXAS RAILWAY COMPANY *v.* HABER.

## ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 268.   Argued January 27, 1898. — Decided March 14, 1898.

The act of Kansas of 1891, c. 201, as amended and as it appears in 2 Gen. Stats. Kansas, 1897, 761, c. 139, relating to bringing into the State cattle liable or capable of communicating Texas, splenic or Spanish fever to any domestic cattle of the State, and providing for the trial of civil actions brought to recover damages therefor, is not overridden by the act of Congress of March 29, 1884, 23 Stat. 31, c. 60, known as the Animal Industry Act, nor by the act of March 3, 1891, 26 Stat. 1044, 1049, c. 544, appropriating money to carry out the provisions of the above act, nor by section 5258 of the Revised Statutes, authorizing every railroad company in the United States, operated by steam, its successors and assigns, "to carry upon and over its road, boats, bridges and ferries all passengers, troops, Government supplies, mails, freight and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of destination"; as Congress has not assumed to give to any corporation, company or person the affirmative right to transport from one State to another State cattle that were liable to impart or capable of communicating contagious, infectious or communicable diseases.

Whether a corporation transporting, or the person causing to be transported from one State to another, cattle of the class specified in the Kansas statute should be liable in a civil action for any damages sustained by the owners of domestic cattle by reason of the introduction into their State of such diseased cattle, is a subject about which the act of March 29, 1884, c. 60, 23 Stat. 31, known as the Animal Industry Act, did not make any provision.

The provision in the Kansas act imposing such civil liability is in aid of the objects which Congress had in view when it passed the Animal Industry Act, and it was passed in execution of a power with which the State did not part when entering the Union, namely, the power to protect the people in the enjoyment of their rights of property, and to provide for the redress of wrongs within its limits, and is not, within the meaning of the Constitution, nor in any just sense, a regulation of commerce among the States.

A state statute, although enacted in pursuance of a power not surrendered to the General Government, must in the execution of its provisions yield in case of conflict to a statute constitutionally enacted under authority conferred upon Congress; and this, without regard to the source of power whence the state legislature derived its enactment.

Neither corporations nor individuals are entitled by force alone of the Constitution of the United States and without liability for injuries resulting therefrom to others, to bring into one State from another State cattle liable to impart or capable of communicating disease.to domestic cattle.

Although the powers of a State must in their exercise give way to a power exerted by Congress under the Constitution, it has never been adjudged that that instrument by its own force gives any one the right to introduce into a State, against its will, cattle so affected with disease that their presence in the State will be dangerous to domestic cattle.

Prior cases reviewed and held to proceed upon the ground that the regulation of the enjoyment of the relative rights, and the performance of the duties, of all persons within the jurisdiction of a State belongs primarily to such State under its reserved power to provide for the safety of all persons and property within its limits; and that even if the subject of such regulations be one that may be taken under the exclusive control of Congress, and be reached by national legislation, any action taken by the State upon that subject that does not directly interfere with rights secured by the Constitution of the United States or by some valid act of Congress, must be respected until Congress intervenes.

An act of Congress that does no more than give authority to railroad companies to carry " freight and property" over their respective roads from one State to another State, will not authorize a railroad company to carry into a State cattle known, or which by due diligence may be known, to be in such a condition as to impart or communicate disease to the domestic cattle of such State.

If the carrier takes diseased cattle into a State, it does so subject for any injury thereby done to domestic cattle to such liability as may arise under any law of the State, that does not go beyond the necessities of the case and burden or prohibit interstate commerce, and a statute prescribing as a rule of civil conduct that a person or corporation shall not bring into the State cattle known, or which by proper diligence could be known, to be capable of communicating disease to domestic cattle, cannot be regarded as beyond the necessities of the case, nor as interfering with any right intended to be given or recognized by section 5258 of the Revised Statutes.

If Congress could authorize the carrying of such cattle from one State into another State, and by legislation protect the carrier against all suits for damages arising therefrom, it has not done so, nor has it enacted any statute that prevents a State from prescribing such a rule of civil conduct as that found in the statute of Kansas.

THE case is stated in the opinion.

*Mr. James Hagerman*, *Mr. T. N. Sedgwick* and *Mr. Simon Sterne* for plaintiff in error.

*Mr. E. W. Cunningham*, *Mr. J. Jay Buck* and *Mr. W. C.*

*Perry* for defendants in error.   *Mr. Eugene Hagan* was with them on their briefs.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought in one of the courts of Kansas against the Missouri, Kansas and Texas Railway Company, a corporation of that State, and certain persons constituting the respective firms of F. Brogan & Sons and Hozier Bros. Its object was to recover the damages sustained by the plaintiff Charles Haber, one of the appellees, by reason of the defendants having brought and caused to be brought into that State certain cattle alleged to have been affected with the disease known as Texas, splenic or Spanish fever, and communicated by them to the plaintiff's cattle whereby the latter sickened and died.

Many persons having like causes of action intervened as parties defendant, and each by cross-petition asked judgment against the railway company.

It appeared in evidence that Hozier Bros. in the spring of 1892 owned and controlled a ranch of several thousand acres of land in Pecos County, Texas, upon which cattle known as Texas cattle were permitted to range. They entered into an agreement with F. Brogan & Sons, whereby the latter were to receive from the former a part of the above cattle at some point in Lyon County, Kansas, and take them to their ranch in Chase County in the same State to be there grazed during the summer of 1892. In execution of that agreement, Hozier Bros. caused to be shipped by railroad into Kansas from Pecos County, Texas, about 2500 head of cattle which were delivered by the defendant company in its stock yards at Hartford, Kansas, to F. Brogan & Sons, and by the latter were driven through Lyon and Chase counties to their range. These cattle, it was alleged, communicated Texas, splenic or Spanish fever to domestic cattle that were owned by the plaintiff and by the cross-petitioners.

The case was tried and submitted to the jury only as between the plaintiff, the cross-petitioners and the railway com-

pany, the latter denying liability for any damages sustained by the former. The trial resulted in verdicts and judgments in favor of the plaintiff and of each of the cross-petitioners. The judgments having been affirmed by one final judgment in the Supreme Court of Kansas, the case is here upon a writ of error sued out by the railway company, which contends that effect has been given to statutes of the State that are repugnant to the Constitution and laws of the United States. That contention involves the Federal question presented for determination.

In 1881 the legislature of Kansas passed an act for the protection of cattle in that State against contagious diseases. Laws of Kansas, 1881, c. 161. But those provisions need not be set out here, because they appear in subsequent enactments to which we will presently refer.

By a state enactment approved March 25, 1884, provision was made for a Live Stock Sanitary Commission, which was charged with the duty of protecting "the health of the domestic animals of the State from all contagious or infectious diseases of a malignant character," and was empowered to establish, maintain and enforce such quarantine, sanitary and other regulations as it deemed necessary. Laws of 1884, c. 2, § 2. And by an act approved March 26, 1884, that commission was authorized to create and enforce quarantine against the disease known as Texas, splenic or Spanish fever in the unorganized counties of the State. Laws of 1884, c. 4, § 1. The commission was also authorized and directed by another act approved on the same day to coöperate with the Commissioner of Agriculture of the United States or any officer of the General Government in the suppression and extirpation of contagious diseases among domestic animals, and in the enforcement and execution of all acts of Congress passed to prevent the importation or exportation of diseased cattle and the spread of infectious or contagious disease among domestic animals. Laws of 1884, c. 5, § 1.

In 1885 another statute was passed, which was amended in 1891. Laws of 1891, c. 201. As amended, and as it appears in General Statutes of Kansas of 1897, vol. 2, c. 139, p. 761,

that statute made it a misdemeanor for any person, between the first day of February and the first day of December of any year, to drive or cause to be driven into or through any county in the State, or to turn upon or cause to be turned or kept upon any highway, range, common or pasture within the State, any cattle capable of communicating or liable to impart what is known as Texas, splenic or Spanish fever. § 13. By another section it was made the duty of any sheriff, under sheriff, deputy sheriff or constable within the State, upon complaint made to him that there were within the county where such officer resided cattle believed to be capable of communicating or liable to impart the disease known as Texas, splenic or Spanish fever, to forthwith take charge of and restrain them under such temporary quarantine regulations as would prevent the communication of such disease, and make immediate report thereof to the Live Stock Sanitary Commission. § 14.

Other sections provided —

"§ 16. Any person or persons who shall drive, ship or transport, or cause to be shipped, driven or transported, into or through any county in this State, any cattle liable or capable of communicating Texas, splenic or Spanish fever, to any domestic cattle of this State, shall be liable to any person or persons injured thereby for all damages that they may sustain by reason of the communication of said disease, or Texas, splenic or Spanish fever, to be recovered in a civil action in any court of competent jurisdiction, and the parties so injured shall have a first and prior lien to all other liens for such damages on the cattle communicating the disease of Texas, splenic or Spanish fever.

"§ 17. In the trial of any person charged with the violation of any provisions of this act, and in the trial of any civil action brought to recover damages for the communication of Texas, splenic or Spanish fever, proof that the cattle which such person or persons are charged with shipping, driving or keeping, or which are claimed to have communicated the said diseases, were brought into this State from south of the thirty-seventh parallel of north latitude, shall be taken as

*prima facie* evidence that such cattle were, between the first day of February and the first day of December of the year in which the offence was committed, capable of communicating and liable to impart Texas, splenic or Spanish fever, within the meaning of this act, and that the owner or owners or person or persons in charge of such cattle had full knowledge and notice thereof. If the owner or owners or person or persons in charge of said cattle shall show by such certificate or certificates, as shall hereafter be designated by the Live Stock Sanitary Commission of the State, that the said cattle had been kept since the first day of December of the previous year west of the twenty-second meridian of longitude west from Washington, and north of the thirty-fourth parallel of north latitude, the provisions of this section shall not apply thereto.

"§ 18. Whenever two or more persons shall in violation of this act, at the same time or at different times during the same year, drive or cause to be driven upon the same highway range, common or pasture within this State, any cattle capable of communicating or liable to impart Texas, splenic or Spanish fever, they shall be jointly and severally liable for all damages that may arise from the communication of such disease at any time thereafter during the same year to any native, domestic or acclimated cattle that shall have been upon the same highway, range, common or pasture so previously travelled over by such first-mentioned cattle."

The general contention of the plaintiff in error is that the act of Congress of May 29, 1884, 23 Stat. 31, c. 60, known as the Animal Industry Act, together with the act of March 3, 1891, 26 Stat. 1044, 1049, c. 544, appropriating money to carry out the provisions of that act, and section 5258 of the Revised Statutes relating to the transportation of passengers, freight, property, etc., from one State to another State by railroad, cover substantially the whole subject of the transportation from one State to another State of live stock liable to impart or capable of communicating infectious or contagious diseases, and therefore that the State of Kansas has no authority to deal in any form with that subject.

Are the acts of Congress and the regulations established under their authority of such a character that the legislation of Kansas is without effect so far as it relates to injury done to domestic cattle by the bringing into that State of cattle liable to impart or capable of communicating Texas, splenic or Spanish fever to domestic cattle?

The act of Congress of May 29, 1884, provided for the establishment of a Bureau of Animal Industry, and for the appointment of a chief thereof and two competent, practical stock raisers or experienced business men familiar with questions pertaining to commercial transactions in live stock, whose duty it should be under the instructions of the Commissioner of Agriculture, to investigate and report upon the condition of the domestic animals of the United States, their protection and use, and also to examine and report upon the best methods of treating, transporting and caring for animals, and the means to be adopted for the suppression and extirpation of contagious pleuro-pneumonia, and to provide against the spread of other dangerous, contagious, infectious and communicable diseases. §§ 1, 2.

By other sections of the act it was provided:

"§ 3. That it shall be the duty of the Commissioner of Agriculture to prepare such rules and regulations as he may deem necessary for the speedy and effectual suppression and extirpation of said diseases, and to certify such rules and regulations to the executive authority of each State and Territory, and invite said authorities to coöperate in the execution and enforcement of this act. Whenever the plans and methods of the Commissioner of Agriculture shall be accepted by any State or Territory in which pleuro-pneumonia or other contagious, infectious or communicable disease is declared to exist, or such State or Territory shall have adopted plans and methods for the suppression and extirpation of said diseases, and such plans and methods shall be accepted by the Commissioner of Agriculture, and whenever the Governor of a State or other properly constituted authorities signify their readiness to coöperate for the extinction of any contagious, infectious or communicable disease in conformity with the provisions of

this act, the Commissioner of Agriculture is hereby authorized to expend so much of the money appropriated by this act as may be necessary in such investigations, and in such disinfection and quarantine measures as may be necessary to prevent the spread of the disease from one State or Territory into another.

"§ 4. That in order to promote the exportation of live stock from the United States the Commissioner of Agriculture shall make special investigation as to the existence of pleuro-pneumonia, or any contagious, infectious or communicable disease, along the dividing lines between the United States and foreign countries, and along the lines of transportation from all parts of the United States to ports from which live stock are exported, and make report of the results of such investigation to the Secretary of the Treasury, who shall, from time to time, establish such regulations concerning the exportation and transportation of live stock as the results of said investigations may require.

"§ 5. That to prevent the exportation from any port of the United States to any port in a foreign country of live stock affected with any contagious, infectious or communicable disease, and especially pleuro-pneumonia, the Secretary of the Treasury be, and he is hereby, authorized to take such steps and adopt such measures, not inconsistent with the provisions of this act, as he may deem necessary.

"§ 6. That no railroad company within the United States, or the owners or masters of any steam or sailing or other vessel or boat, shall receive for transportation or transport, from one State or Territory to another, or from any State into the District of Columbia, or from the District into any State, any live stock affected with any contagious, infectious or communicable disease, and especially the disease known as pleuro-pneumonia; nor shall any person, company or corporation deliver for such transportation to any railroad company, or master or owner of any boat or vessel, any live stock, knowing them to be affected with any contagious, infectious or communicable disease; nor shall any person, company or corporation drive on foot or transport in private conveyance from

one State or Territory to another, or from any State into the District of Columbia, or from the District into any State, any live stock, knowing them to be affected with any contagious, infectious or communicable disease, and especially the disease known as pleuro-pneumonia: *Provided,* That the so-called splenetic or Texas fever shall not be considered a contagious, infectious or communicable disease within the meaning of sections four, five, six and seven of this act, as to cattle being transported by rail to market for slaughter, when the same are unloaded only to be fed and watered in lots on the way thereto.

"§ 7. That it shall be the duty of the Commissioner of Agriculture to notify, in writing, the proper officials or agents of any railroad, steamboat or other transportation company doing business in or through any infected locality, and by publication, in such newspapers as he may select, of the existence of said contagion; and any person or persons operating any such railroad, or master or owner of any boat or vessel, or owner or custodian of or person having control over such cattle or other live stock within such infected district, who shall knowingly violate the provisions of section six of this act, shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine not less than one hundred nor more than five thousand dollars, or by imprisonment for not more than one year, or by both such fine and imprisonment."

"§ 10. That the sum of one hundred and fifty thousand dollars, to be immediately available, or so much thereof as may be necessary, is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, to carry into effect the provisions of this act."

1. The answer of the railway company as well as its requests for instructions, and the opinion of the Supreme Court of the State, show that the company contended throughout this litigation that legislation by Congress and the regulations prescribed by the Secretary of Agriculture in execution of the Animal Industry Act, furnished a complete defence to all claims for damages asserted in this action. That contention

was overruled by the trial court, as well as by the Supreme Court of the State. If the contention of the railway company had been sustained, the verdict and judgment must have been in its favor without reference to any other question in the case. In other words, the state court could not properly have disposed of the case without deciding the Federal question raised by the company. This court therefore has jurisdiction to inquire whether the Supreme Court of Kansas erred in holding that the legislation of Congress and the regulations of the Secretary of the Interior[1] gave to the railway company the right, privilege and immunity specially set up and claimed by it. The motion to dismiss for want of jurisdiction in this court is consequently overruled. *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245, 251; *Chicago Life Ins. Co* v. *Needles*, 113 U. S. 574, 579; *Sayward* v. *Denny*, 158 U. S. 180, 184; *Chicago, Burlington & Quincy Railroad* v. *Chicago*, 166 U. S. 226, 232.

2. If sections 16 and 17 of the Kansas act of 1885, as amended in 1891, are not inconsistent with the legislation of Congress, no question can be raised as to other provisions of the Kansas statutes. The sixteenth section, we have seen, provides that any person or persons, driving, shipping or transporting, or causing to be driven, shipped or transported, into or through any county in that State, cattle liable to impart or capable of communicating Texas, splenic or Spanish fever to any domestic cattle of Kansas, shall be liable in a civil action to any person injured thereby for all damages sustained by reason of the communication of such fever to his cattle; while the seventeenth section makes the bringing into the State, from south of the 37th parallel of north latitude, of cattle alleged to have communicated Texas, splenic or Spanish fever

---

[1] By the act approved February 9, 1889, 25 Stat. 659, c. 122, the Department of Agriculture was made an Executive Department. And by the act of March 2, 1889, 25 Stat. 835, 840, c. 373, the authority granted to the Commissioner of Agriculture by the act of May 29, 1884, 23 Stat. 31, establishing the Bureau of Animal Industry, and by the provision of the appropriation act for the Agricultural Department, approved July 18, 1888, relating to that Bureau, was vested in the Secretary of Agriculture. The regulations above referred to were issued by Secretary Rusk, February 26, 1892.

to domestic cattle, *prima facie* evidence that such cattle were, between February 1st and December 1st in any year, capable of communicating that disease, and that the owner or person in charge of such cattle had full knowledge and notice thereof.

May not these statutory provisions stand without obstructing or embarrassing the execution of the act of Congress? This question must of course be determined with reference to the settled rule that a statute enacted in execution of a reserved power of the State is not to be regarded as inconsistent with an act of Congress passed in the execution of a clear power under the Constitution, unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or stand together. *Sinnot* v. *Davenport*, 22 How. 227, 243.

We have seen that the first section of the Animal Industry Act provided for an investigation as to the condition of the domestic animals of the United States, their protection and use, the causes of contagious, infectious and communicable diseases among them, and the means for the prevention and cure of such diseases. The second section provided for an examination as to the best methods of treating, transporting and caring for animals and the means to be adopted for the suppression and extirpation of contagious pleuro-pneumonia, and to guard against the spreading of other dangerous, contagious, infectious and communicable diseases. If any State was ready to coöperate with the Commissioner of Agriculture, then, by the third section, that officer was authorized to use the money appropriated by Congress in such investigations and in such disinfection and quarantine measures as were necessary "to prevent the spread of the disease from one State or Territory into another." While the States were invited to coöperate with the General Government in the execution and enforcement of the act, whatever power they had to protect their domestic cattle against such diseases was left untouched and unimpaired by the act of Congress.

The act of Congress did not assume to give any corporation, company or person the affirmative right to transport from one State to another State cattle that were liable to impart or capable of communicating contagious, infectious or communi-

cable diseases. On the contrary, it was made a misdemeanor to deliver for transportation or to transport or drive from one State to another, cattle known to be affected with contagious, infectious or communicable diseases. Whether a corporation transporting, or the person causing to be transported from one State to another cattle of the class specified in the Kansas statute, should be liable in a civil action for any damages sustained by the owners of domestic cattle by reason of the introduction into their State of such diseased cattle, is a subject about which the Animal Industry Act did not make any provision. That act does not declare that the regulations established by the Department of Agriculture should have the effect to exempt from civil liability one who, but for such regulations, would have been liable either under the general principles of law or under some state enactment for damages arising out of the introduction into that State of cattle so affected. And, as will be seen from the regulations prescribed by the Secretary of Agriculture, that officer did not assume to give protection to any one against such liability.

By those regulations the Secretary gave notice to the "managers and agents of railroad and transportation companies of the United States, stockmen and others" that "a contagious and infectious disease known as splenetic or Southern fever exists among cattle" within certain parts of the United States, the outer line of which area or boundary was fully defined by that officer. The same regulations provided that from the 1st day of March to the 1st day of December, 1892, no cattle should be transported from any part of the country included in that area or boundary to any part of the United States north or west of the described line except by rail for immediate slaughter, and when so transported certain directions were to be observed in handling and caring for them. The regulations made provision for moving cattle from specified parts of Tennessee in accordance with the rules established by the authority of that State. Rules were also prescribed for moving cattle from named counties in Texas to the States of Colorado, Wyoming and Montana, "in ac-

cordance with the regulations made by said States for the admission of Southern cattle thereto."

The cattle in question were originally received by the Texas and Pacific Railroad at Midland, Texas, outside of but near to the boundary of the " infected district " as defined by the Secretary of Agriculture. They were received by the defendant company at Dennison, Texas, as a connecting carrier, in the same cars in which they were loaded, and the entire route to the southern boundary line of Kansas was through that district. It may be that in the transportation of the cattle in question from Pecos County, Texas, through the infected district, all the regulations prescribed by the Secretary were observed. But that fact does not show that Congress intended or assumed to exempt any one complying with those regulations from liability to the owners of domestic cattle to which were communicated the contagious disease with which the cattle brought into the State were affected. The controlling object of the regulations was to prevent the spreading from one State to another of the cattle disease in question, not to deprive any one of the right to recover damages for injury inflicted upon his domestic cattle by reason of their being brought into contact with diseased cattle.

It is said that the statute of Kansas giving a right of action for damages is, in itself, a regulation of commerce among the States, and, therefore, inconsistent with the power of Congress to regulate such commerce. But that statute is not, within the meaning of the Constitution, nor in any just sense, a regulation of commerce among the States. It cannot be supposed to have been so intended, even if its validity were to depend upon the intent with which it was enacted. It did nothing more than declare as a rule of civil liability in Kansas, that any one driving, shipping or transporting or causing to be driven, shipped or transported into or through any county in that State, cattle liable to impart or capable of communicating Texas, splenic or Spanish fever to domestic cattle, should be responsible in damages to any persons injured thereby. In fact, the state law is in aid of the objects which Congress had in view when it passed the Animal Industry Act. It was

passed in execution of a power with which the State did not part when entering the Union, namely, the power to protect the people in the enjoyment of their rights of property, and to provide for the redress of wrongs within its limits. We must not be understood as saying that this power may be so exerted as to defeat or burden the exercise of any power granted to Congress. On the contrary, a state statute, although enacted in pursuance of a power not surrendered to the General Government, must in the execution of its provisions yield in case of conflict to a statute constitutionally enacted under authority conferred upon Congress; and this, as was said by Mr. Justice Nelson, speaking for the court in *Sinnot* v. *Davenport*, above cited, " without regard to the source of power whence the state legislature derived its enactment." This results, as was said by Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, 210, as well from the nature of the Government as from the words of the Constitution. In that case, the argument was pressed that if a law passed by a State in the exercise of its acknowledged sovereignty comes into conflict with a law passed by Congress in pursuance of the Constitution, they affect the subject and each other like " equal opposing powers." Touching that view, the Chief Justice said : " But the framers of our Constitution foresaw this state of things, and provided for it, by declaring the supremacy not only of itself, but of the laws made in pursuance of it. The nullity of any act, inconsistent with the Constitution, is produced by the declaration that the Constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the state legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged state powers, interfere with, or are contrary to the laws of Congress, made in pursuance of the Constitution, or some treaty made under the authority of the United States. In every such case, the act of Congress, or the treaty, is supreme ; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it."

Nor is the statute of Kansas to be deemed a regulation of

commerce among the States, simply because it may incidentally or indirectly affect such commerce. *Hennington* v. *Georgia,* 163 U. S. 299, 317; *New York, New Haven & Hartford Railroad* v. *New York,* 165 U. S. 628, 631; *Chicago, Milwaukee & St. Paul Railway* v. *Solan,* 169 U. S. 133; *Richmond & Alleghany Railroad* v. *Patterson Tobacco Co.,* 169 U. S. 311, and authorities cited in each case. Although the power of Congress to regulate commerce among the States, and the power of the States to regulate their purely domestic affairs, are distinct powers, which, in their application, may at times bear upon the same subject, no collision that would disturb the harmony of the National and state governments or produce any conflict between the two governments in the exercise of their respective powers need occur, unless the National Government, acting within the limits of its constitutional authority, takes under its immediate control and exclusive supervision the entire subject to which the state legislation may refer. "The same bale of goods," Mr. Justice Johnson well said in his concurring opinion in *Gibbons* v. *Ogden,* "the same cask of provisions, or the same ship, that may be the subject of commercial regulations, may also be the vehicle of disease. And the health laws that require them to be stopped and ventilated are no more intended as regulations on commerce than the laws which permit their importation are intended to inoculate the community with disease. Their different purposes mark the distinction between the powers brought into action; and while frankly exercised, they can produce no serious collision." 9 Wheat. 235. It is, therefore, a mistake to say that the Kansas statute so far as it gives a right of action for injuries arising from disease communicated to domestic cattle by cattle of a particular kind brought into the State comes into conflict with any regulation established under the authority of Congress, to prevent the spread of contagious or infectious diseases from one State to another. That statute, we repeat, only embodies a rule of civil conduct prescribed by a State whose government is competent to regulate — in subordination always to the supreme law of the land and its

own fundamental law — the relative rights and obligations of
all within its jurisdiction. Neither corporations nor individ-
uals are entitled, by force alone of the Constitution of the
United States and without liability for injuries resulting there-
from to others, to bring into one State from another State
cattle liable to impart or capable of communicating disease
to domestic cattle. The contrary cannot be affirmed under
any sound interpretation of the Constitution. This court
while sustaining the power of Congress to regulate commerce
among the States has steadily adhered to the principle that
the States possess, because they have never surrendered, the
power to protect the public health, the public morals, and the
public safety, by any legislation appropriate to that end which
does not encroach upon rights guaranteed by the National Con-
stitution, nor come in conflict with acts of Congress passed in
pursuance of that instrument. Although the powers of a State
must in their exercise give way to a power exerted by Congress
under the Constitution, it has never been adjudged that that in-
strument by its own force gives any one the right to introduce
into a State, against its will, cattle so affected with disease
that their presence in the State will be dangerous to domestic
cattle.

This principle is illustrated in many adjudged cases. In
*Railroad Co.* v. *Husen*, 95 U. S. 465, 471, 473, — a case much
relied on by the plaintiff in error, — this court held to be un-
constitutional a statute of Missouri declaring that no Texas,
Mexican or Indian cattle, not kept the entire previous winter
in that State, should be driven or otherwise conveyed into or
remain in any county in that State between the first day of
March and the first day of November in each year. The
statute contained a proviso to the effect "that when such
cattle shall come across the line of this State, loaded upon a
railroad car or steamboat, and shall pass through this State
without being unloaded, such shall not be construed as pro-
hibited by this act; but the railroad company or owners of a
steamboat performing such transportation shall be responsible
for all damages which may result from the disease called the
Spanish or Texas fever, should the same occur along the line

of such transportation; and the existence of such disease along such route shall be *prima facie* evidence that such disease has been communicated by such transportation." It also provided : " If any person or persons shall bring into this State any Texas, Mexican or Indian cattle, in violation of the first section of this act, he or they shall be liable, in all cases, for all damages sustained on account of disease communicated by said cattle." In that case, the court cited with approval the language of the Supreme Court of Vermont in *Thorpe* v. *Rutland & Burlington Railroad*, 27 Vermont, 140, in which it was said that, by the general police power of a State, " persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the State ; of the perfect right of the legislature to do which no question ever was, or upon acknowledged general principles ever can be made, so far as natural persons are concerned." Under that power, this court said, that while a State by legislation may not invade the domain of the National Government, it may *exclude* from its limits convicts, paupers, idiots and lunatics, persons likely to become a public charge, as well as persons affected by contagious or infectious diseases — adding, that the same principle " would justify the exclusion of property dangerous to the property of citizens of the State, for example, *animals having contagious or infectious diseases.*" Such exertions of power by a State, it was said, were self-defensive. In affirming the invalidity of state legislation professing to be an exercise of police powers for protection against evils from abroad, but which was beyond the necessity for its exercise, and interfered with the rights and powers of the Federal Government, the court, speaking by Mr. Justice Strong, said, p. 473 : " Tried by this rule, the statute of Missouri is a plain intrusion upon the exclusive domain of Congress. It is not a quarantine law. It is not an inspection law. It says to all natural persons and to all transportation companies, ' You shall not bring into the State any Texas cattle or any Mexican cattle, or Indian cattle between March 1st and December 1st in any year, no matter whether they are free from disease or not, no matter whether

they may do an injury to the inhabitants of the State or not; and if you do bring them in, even for the purpose of carrying them through the State without unloading them, you shall be subject to extraordinary liabilities.' Such a statute, we do not doubt, it is beyond the power of a State to enact. To hold otherwise would be to ignore one of the leading objects which the Constitution of the United States was designed to secure."

The decision in that case was placed distinctly on the ground that although the State could prevent persons and animals suffering under contagious or infectious diseases, or convicts, etc., from entering the State, it could not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce, and the Missouri statute was held to be unconstitutional because it went beyond the necessities of the case, having been so drawn as to exclude all Texas, Mexican or Indian cattle from the State, (except cattle to be transported across and out of the State,) whether free from disease or not, or whether they would or would not do injury to the inhabitants of the State.

No such criticism can be made of the statute of Kansas. It does not prohibit the bringing into the State of *all* Texas cattle. It does not in any true sense prohibit or burden any commerce among the States specifically authorized by Congress; but, for purposes of self-protection only and in the exercise of its inherent power to protect the property of its people, declared that any corporation or person bringing into the State or driving into or through any county of the State cattle liable to impart or capable of communicating Texas, splenic or Spanish fever to domestic cattle, should be responsible in damages to any one to whose cattle that disease was communicated by the cattle so brought into the State.

The general views we have expressed are sustained by *Kimmish* v. *Ball*, 129 U. S. 217, 220, 222. That case involved the validity of section 4059 of the Iowa Code providing, in respect of Texas cattle that had not been wintered at least one winter north of the southern boundary of Missouri or Kansas, that "if any person now or hereafter has in his pos-

session, in this State, any such Texas cattle, he shall be liable for any damages that may accrue from allowing said cattle to run at large, and thereby spreading the disease among other cattle known as the Texas fever, and shall be punished as is prescribed in the preceding section." It was contended that that section was in conflict with the power of Congress to regulate commerce among the States, as well as with section 2 of Article 4 of the Constitution of the United States relating to the privileges and immunities of citizens of the several States. The court stated that the statute of Iowa was based upon the notorious fact that cattle which were brought during the spring and summer months from Texas and Arkansas and from the Indian Territory, were often affected with what is known as Texas fever, and that all danger of infection therefrom could be removed by cold weather, such as was usual in the country north of the southern boundary of Missouri and Kansas. Speaking by Mr. Justice Field, it said: " Section 4059, with which we are concerned, provides that any person who has in his possession in the State of Iowa any Texas cattle which have not been wintered north shall be liable for any damages that may accrue from allowing such cattle to run at large and thereby spread the disease. We are unable to appreciate the force of the objection that such legislation is in conflict with the paramount authority of Congress to regulate interstate commerce. We do not see that it has anything to do with that commerce; it is only levelled against allowing diseased Texas cattle held within the State to run at large." In reference to the other objection made to the act, the court said: " There is no denial of any rights and privileges to citizens of other States which are accorded to citizens of Iowa. No one can allow diseased cattle to run at large in Iowa without being held responsible for the damages caused by the spread of the disease thereby; and the clause of the Constitution declaring that the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States does not give non-resident citizens of Iowa any greater privileges and immunities in that State than her own citizens there enjoy. So far as liability is concerned for the act mentioned,

citizens of other States and citizens of Iowa stand upon the same footing."

The case of *Sherlock* v. *Alling*, 93 U. S. 99, 103, well illustrates the principle which, we think, must control the present case. That was an action for damages under a statute of Indiana, giving a right of action in favor of the personal representative of one whose death was caused by the wrongful act or omission of another, whenever the latter, if he had lived, could sue for an injury for the same act or omission. In that case the death, on account of which the suit was brought, occurred by reason of a collision between two steamboats navigating the Ohio River. It appears from the report of the case that one of the grounds of defence was that at the time of the alleged injuries the colliding boats were engaged in carrying on interstate commerce under the laws of the United States, and that the defendants, as their owners, were not liable for injuries occurring in navigation through the carelessness of their officers, except as prescribed by Congress; and that the acts of Congress did not cover the liability asserted by the plaintiff under the statute of Indiana. The act of Congress referred to was that of March 30, 1852, 10 Stat. 61, c. 106, providing for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam. After referring to some of the principal cases in which state enactments had been held void for interfering with the freedom of interstate commerce, the court said that the Indiana statute "imposes no tax, prescribes no duty, and in no respect interferes with any regulations for the navigation and use of vessels. It only declares a general principle respecting the liability of all persons within the jurisdiction of the State for torts resulting in the death of parties injured. And in the application of the principle it makes no difference where the injury complained of occurred in the State, whether on land or on water. General legislation of this kind, prescribing the liabilities or duties of citizens of a State, without distinction as to pursuit or calling, is not open to any valid objection because it may affect persons engaged in foreign or interstate commerce. Objection might with equal propriety

be urged against legislation prescribing the form in which contracts shall be authenticated, or property descend or be distributed on the death of its owner, because applicable to contracts or estates of persons engaged in such commerce. In conferring upon Congress the regulation of commerce it was never intended to cut the State off from legislating on all subjects relating to the health, life and safety of their citizens, though the legislation might indirectly affect the commerce of the country. Legislation, in a great variety of ways, may affect commerce and persons engaged in it without constituting a regulation of it, within the meaning of the Constitution." Again, in the same case: "Until Congress, therefore, makes some regulation touching the liability of parties for marine torts resulting in the death of the persons injured, we are of opinion that the statute of Indiana applies, giving a right of action in such cases to the personal representatives of the deceased, and that, as thus applied, it constitutes no encroachment upon the commercial power of Congress."

In *Patterson* v. *Kentucky*, 97 U. S. 501, 505, this court said that "the States may by police regulations protect their people against the introduction within their respective limits of infected merchandise," and by like regulations "exclude from their midst, not only convicts, paupers, idiots, lunatics and persons likely to become a public charge, but animals having contagious diseases."

So it has been held that in the absence of legislation by Congress on the subject, a State may prescribe, as a rule of civil conduct, that engineers on railroad trains engaged in the transportation of passengers and freight, including interstate trains, shall undergo an examination by a state board as to their qualifications, before becoming entitled to operate locomotive engines within such State, and that persons employed on railways shall be subjected to like examination with respect to their power of vision. *Smith* v. *Alabama*, 124 U. S. 465, 482; *Nashville &c. Railway* v. *Alabama*, 128 U. S. 96, 101.

In *New York, New Haven & Hartford Railroad* v. *New York*, 165 U. S. 628, 633, it was contended that section 5258

of the Revised Statutes, relating to transportation of persons and property from one State to another State, so far covered the whole subject of interstate transportation as to render inapplicable to interstate carriers a statute of New York regulating the heating of steam passenger cars, and directing guards and guard posts to be placed on railroad bridges and trestles. But this court said that the authority conferred by Congress "upon railroad companies engaged in commerce among the States, whatever may be the extent of such authority, does not interfere in any degree with the passage by the state of laws having. for their object the personal security of passengers while travelling, within their respective limits, from one State to another on cars propelled by steam."

In *Western Union Tel. Co.* v. *James*, 162 U. S. 650, 660, this court sustained as valid a statute of Georgia requiring every telegraph company, with a line of wires wholly or partly within that State, to receive dispatches, and, on payment of the usual charges, to transmit or deliver them with due diligence, under a penalty of one hundred dollars. It was contended in that case, as to telegraph messages from points outside to points inside the State, that the local statute was a regulation of interstate commerce, and, therefore, void. That contention was overruled, the court saying: "It would not unfavorably affect or embarrass it in the course of its employment, and hence until Congress speaks upon the subject, it would seem that such a statute must be valid. It is the duty of a telegraph company which receives a message for transmission, directed to an individual at one of its stations, to deliver that message to the person to whom it is addressed, with reasonable diligence and in good faith. That is a part of its contract, implied by taking the message and receiving payment therefor. The statute in question is of a nature that is in aid of the performance of a duty of the company that would exist in the absence of any such statute, and it is in nowise obstructive of its duty as a telegraph company. It imposes a penalty for the purpose of enforcing this general duty of the company. The direction that the delivery of the message shall be made with impartiality and in good faith

and with due diligence is not an addition to the duty which it would owe in the absence of such a statute. Can it be said that the imposition of a penalty for the violation of a duty which the company owed by the general law of the land is a regulation of or an obstruction to interstate commerce within the meaning of that clause of the Federal Constitution under discussion? We think not."

These cases all proceed upon the ground that the regulation of the enjoyment of the relative rights, and the performance of the duties, of all persons within the jurisdiction of a State belong primarily to such State under its reserved power to provide for the safety of all persons and property within its limits; and that even if the subject of such regulations be one that may be taken under the exclusive control of Congress, and be reached by national legislation, any action taken by the State upon that subject that does not directly interfere with rights secured by the Constitution of the United States or by some valid act of Congress, must be respected until Congress intervenes.

It is suggested that the statute is so drawn that the railway company would be liable, even if it acted in good faith, and had no reason to believe, after the exercise of the utmost diligence, that the cattle it received for transportation were liable to impart or were capable of communicating the fever named in the statute. If the statute were thus interpreted, it might be — though upon that point we express no opinion — that it would be so oppressive in its necessary operation as to be deemed a burden upon the transportation of all cattle from Texas, whether diseased or not, and for that reason be liable to the same objection urged against the statute involved in *Railroad Co.* v. *Husen.* But we do not so construe the statute. Its sixteenth section must be interpreted in connection with the seventeenth section. The latter, as we have stated, declares that in the trial of any civil action, under the statute, proof that the cattle were brought into the State from south of the thirty-seventh parallel of north latitude — the southern boundary line of Kansas — should be *prima facie* evidence that they were, between the first day of February

and the first day of December, capable of communicating and liable to impart Texas, splenic or Spanish fever, and that "the owner or owners, or person or persons, in charge of such cattle had full knowledge or notice thereof." As the State is competent to protect its domestic cattle against disease that may be communicated by cattle coming from beyond its limits, this rule of evidence cannot be regarded as inconsistent with any right secured by the National Constitution or as obstructing commerce among the States; for the rule finds its justification in the fact, heretofore recognized by this court, and substantially by the act of Congress, that Texas cattle, when brought northward during the spring and summer months, often carry the germs of fever, or are often, though not always, infected with fever that may be communicated by them to domestic cattle. That rule as prescribed implies that damages shall not be recovered if, from all the evidence, it appears that the defendant had no knowledge or notice that the cattle were of the kind forbidden by the statute to be brought into the State. This was the interpretation placed upon the statute by the plaintiff. His petition alleges that before the cattle in question were shipped, transported and driven as stated, the defendants had knowledge, and were put upon inquiry, and had reason to know, that "said Texas cattle so kept, shipped, transported and driven were of a kind capable of communicating and liable to communicate and impart said disease to the domestic cattle of this State and to the aforesaid cattle of the plaintiff." And under this construction of the statute the case was tried. The trial court, among other things, instructed the jury: "The mere fact that the cattle of the plaintiff or those of any of the cross-petitioning defendants became sick and died from this disease imparted to them by cattle transported by the said defendant into Lyon or Chase counties is not sufficient to warrant a finding against said defendant railway company. You must find from the evidence, first, that Texas cattle were, in fact, brought into this State; of this there is no denial, and you can consider that fact as established; second, that the cattle of the plaintiff and each of the cross-petitioning defendants who seek to recover herein against

said railway, because of the loss of cattle, became infected and died because of the disease imparted to them by such Texas cattle, and that such disease was Texas, splenic or Spanish fever; and, third, that the officers, employés or agents of the railway company defendant had knowledge that such Texas cattle transported by it to this State were liable to impart such disease to the native cattle of this State, or that they ought by the exercise of diligence and care to have known of the dangerous character of these cattle, and that they would or were liable to impart said disease to the native cattle of this State." We do not understand from the opinion of the Supreme Court of the State that it disagreed with this interpretation of the statute.

3. In support of the contention that national legislation leaves no room for state enactments relating to the bringing of diseased cattle into one State from another State, the railway company refers to the act of Congress, approved March 3, 1891, 26 Stat. 1044, 1049, c. 544, appropriating five hundred thousand dollars for carrying out the provisions of the act for establishing the Bureau of Animal Industry, which authorized the Secretary of Agriculture to use any part of that sum he might deem necessary or expedient, and in such manner as he might think best, to prevent the spread of pleuro-pneumonia and other diseases of animals, and for this purpose to employ as many persons as he might deem necessary, and to expend any part of that sum in the purchase and destruction of diseased or exposed animals and the quarantine of the same, whenever in his judgment it is essential to prevent the spread of pleuro-pneumonia or other diseases of animals from one State into another. This contention is disposed of by what has been already said.

4. In support of the same contention, the company refers to section 5258 of the Revised Statutes of the United States, (brought forward from the act of June 15, 1866, 14 Stat. 66, c. 124,) which authorizes every railroad company in the United States, operated by steam, its successors and assigns, "to carry upon and over its road, boats, bridges and ferries all passengers, troops, Government supplies, mails, freight

and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of destination." It is scarcely necessary to say that an act of Congress that does no more than give authority to railroad companies to carry " freight and property " over their respective roads from one State to another State, will not authorize a railroad company to carry into a State cattle known, or which by due diligence may be known, to be in such a condition as to impart or communicate disease to the domestic cattle of such State. A railroad company carrying diseased cattle into a State cannot claim the protection of section 5258, any more than it could when carrying into a State rags known, or which by proper diligence could have been known, to be infected with yellow fever. If the carrier takes diseased cattle into a State, it does so subject for any injury thereby done to domestic cattle to such liability as may arise under any law of the State that does not go beyond the necessities of the case and burden or prohibit interstate commerce. A statute prescribing as a rule of civil conduct that a person or corporation shall not bring into the State cattle known, or which by proper diligence could be known, to be capable of communicating disease to domestic cattle, cannot be regarded as beyond the necessities of the case, nor as interfering with any right intended to be given or recognized by section 5258 of the Revised Statutes.

Applying the principles settled in prior cases to the case before us, it is clear that a railroad company is not in any just sense hindered or obstructed by the statute of Kansas in the exercise of any privilege given or authority conferred by section 5258 of the Revised Statutes. This must be so, unless the company should be held to be entitled, of right, to carry into a State from another State, as freight or property, cattle liable to impart or capable of communicating disease, and of whose condition at the time it had knowledge, or could have had knowledge by the exercise of reasonable diligence. We cannot so hold. And we adjudge that if Congress could authorize the carrying of such cattle from one State into another

State, and by legislation protect the carrier against all suits for damages arising therefrom, it has not done so, nor has it enacted any statute that prevents a State from prescribing such a rule of civil conduct as that found in the statute of Kansas.

5. Much was said at the bar about the finding of the jury being against the evidence. We cannot enter upon such an inquiry. The facts must be taken as found by the jury, and this court can only consider whether the statute, as interpreted to the jury, was in violation of the Federal Constitution. *Chicago, Burlington & Quincy Railroad* v. *Chicago,* 166 U. S. 226, 242, 246.

Perceiving no error in the record in respect of any question of a Federal nature, the judgment of the Supreme Court of Kansas is

*Affirmed.*

Mr. Justice Brewer dissenting.

I am unable to concur in the opinion filed in this case. The statute provides that a carrier bringing into the State cattle which are capable of communicating Texas, splenic or Spanish fever to domestic cattle shall be liable to any persons injured thereby for all damages they may sustain by reason of the communication of said fever. This liability is not limited to the injury which may be done by the cattle while in the possession of the carrier, but extends to that which may be done at any time thereafter in whosesoever possession they may be. And in this particular case it is found by the jury that the fever was communicated and the injury done after the cattle had passed out of the custody of the carrier and into the possession of other persons. The statute also provides that proof that the cattle were brought into Kansas from territory south of the Kansas state line shall be *prima facie* evidence that they were capable of communicating the fever, and that the carrier had knowledge of that fact.

I am not disposed to belittle this question, or the difficulties which attend the effort to prevent a communication of Texas fever and the injuries which result therefrom. On the con-

trary, I fully appreciate the importance of securing to all stock owners in Kansas and elsewhere the fullest protection against this so fatal disease, and believe that stringent measures may properly be adopted to accomplish this result. I differ with my brethren only as to the authority by which such measures should be enacted, and as to the validity of the legislation before us. It is conceded in the opinion of the majority that Congress has full control over interstate commerce, and that it is the only authority by which that commerce can be regulated. On the other hand, it is equally clear, as pointed out, that the States may make many police restrictions and provisions which, while indirectly affecting interstate commerce, do not directly regulate it, and the question is whether this particular statute comes within the category of such police regulations.

It must be premised that Southern cattle which are capable of communicating this disease are not necessarily themselves diseased, or their meat unfit for consumption. This is not a mere conjecture, but a well-established fact. In the Report of the Bureau of Animal Industry, for the years 1891 and 1892, which contains the results of investigations into the nature, cause and prevention of cattle fever, it is said, on pages 266 and 267: "The presence of the parasite in Southern cattle does not seem to materially affect their health, although it may maintain a more or less constant breaking up of the red corpuscles on a small scale, which would necessarily tax certain vital organs. . . . From a practical economic standpoint we must maintain that Southern cattle may be healthy and yet be the cause of Texas fever;" and in the final summing up of the conclusions of the investigators, on page 290, it is further stated: "Cattle from the permanently infected territory, though otherwise healthy, carry the microparasite of Texas fever in their blood."

And in the regulations concerning cattle transportation, promulgated by the United States Department of Agriculture on February 26, 1892, as appears from the record in this case, as also in similar regulations issued by the same Department on December 15, 1897, it is provided that within certain speci-

fied dates no cattle are to be transported from below the Federal quarantine line except by rail or boat for immediate slaughter. These cattle are being constantly forwarded by the thousands to the packing houses of this country, and when butchered their meat is shipped all over the world and used with impunity. Statistics found in the cases of *Cotting* v. *Kansas City Stockyards Company* and *Hopkins* v. *United States*, now pending in this court, show that in the year 1896 (and that is but a sample of other years) of something over 1,700,000 head of cattle shipped to the Kansas City stockyards, more than 500,000 came from the territory proscribed by the Kansas statute, and that of these cattle 60 per cent or more were sold to the packing houses there situate for immediate slaughter.

It appears from the report above referred to, that this fever is generally disseminated by means of a tick, technically called *boophilus bovis*, though the jury in this case, in answer to specific questions, found that the fever was communicable otherwise than in that way. The presence of ticks upon the cattle does not necessarily indicate disease. They are purely external, like fleas on a dog, and do not prove that the body is in an unhealthy condition. It may be a curious fact, the cause of which is not yet fully explained, that these cattle range in the South without developing in themselves or communicating to others this Texas fever, while when brought into the temperate zone they seem to communicate it freely and in a most dangerous form. Whatever may be the explanation of this fact does not abridge its significance. Hence it is that these Southern cattle, although they may have ticks upon them, and thus be liable to communicate the disease to Northern cattle, may be entirely free from any disease, their meat a perfectly healthy article of food, and they themselves legitimate subjects of commerce. If they are, when brought into the North, pastured at a distance from native cattle, and the latter are not thereafter permitted to range in the field in which the former have been kept, the disease will not be communicated, the Southern cattle may safely be fattened, and prepared for market and use. It is only when the native

cattle are permitted to pasture in or near the grounds in which the Southern cattle are or have recently been kept that injury results. The case presented, therefore, is not that of legislation to prevent importation of diseased meat — that which in itself is unhealthy and unfit for use — but something which, if improperly or carelessly handled, may communicate disease and do injury. The very phraseology of the statute indicates this. It does not name diseased cattle, but only those liable to communicate disease. If other Northern States follow with like legislation commerce between the two sections of the country in this most important product of portions of the South will be practically interrupted.

The cases referred to in the opinion of the majority in which the police power of the State has been sustained were cases in which the restrictions or regulations only indirectly affected interstate commerce. As, for instance, requiring an engineer to take out a state license, *Smith* v. *Alabama*, 124 U. S. 465; or to be free from and submit to an examination for color blindness, *Nashville & St. Louis Railway* v. *Alabama*, 128 U. S. 96; prescribing the mode of heating passenger cars, *New York, New Haven & Hartford Railroad* v. *New York*, 165 U. S. 628; requiring the prompt delivery of telegraphic messages under condition of a penalty, *Western Union Telegraph* v. *James*, 162 U. S. 650. Nothing of that kind is prescribed by this statute. No inspection is provided for by the State; none required of the carrier; no duty imposed in respect to the handling and care of the cattle while in its possession. It simply prescribes the conditions upon which the carrier may bring cattle into the State, to wit, liability not merely for injury which its own improper handling may cause, but for injury which may result at any time thereafter from any future improper handling by the consignee or subsequent party into whose custody the cattle may pass. It seems to me, beyond any peradventure, that this is legislation directly regulating commerce between the States, and, as such, is within the sole dominion of Congress. It materially affects the conduct of the carrier outside of the limits of the State. And that is one of the tests of invalidity. *Hall* v. *De Cuir*, 95 U. S. 485, 488;

*Bowman* v. *Chicago & Northwestern Railway*, 125 U. S. 465, 486. Suppose cattle are presented to a carrier in Texas for shipment to Kansas, can it properly refuse to receive and transmit? Can it plead the Kansas statute in defence of its duty as a common carrier? If it says that the cattle have ticks upon them and therefore are liable to communicate Texas fever, or if not having ticks upon them may otherwise (as shown by the verdict of this jury) communicate the disease, the shipper may reply that he intends them for immediate slaughter, and that they are a legitimate article of commerce. But that will not relieve the carrier. The liability imposed by the Kansas statute does not depend upon the intent with which the cattle are shipped into the State; and having delivered them to the consignee, the carrier has no further control. Although shipped with the intention of immediate slaughter, the consignee may change his mind and pasture them in the State. Whatever may have been the intention of the shipment, the liability of the carrier is the same.

I cannot believe that the carrier is thus placed beneath the upper and the nether millstone, liable under the law of Texas to the owner of the cattle if he refuses to ship them, *Bowman* v. *Chicago & Northwestern Railway, supra;* and liable to any one in Kansas under the Kansas statute if injuries result from the improper handling by the consignee or others. The presumption of knowledge, which is provided for in section 17, is, in this aspect of the case, entirely immaterial, and does not affect the validity of the statute. Apply the principle of this legislation to other objects than cattle, and see in what it results. Gunpowder, dynamite, many of the drugs used in medicine, while legitimate articles of commerce, and of great value for certain purposes, may, if improperly or carelessly handled, be the means of doing immense injury. Can a State say to a carrier, You may bring gunpowder or any other article of danger into the State, but if you know its dangerous character you shall be responsible for all damages that it may cause in the hands of the consignee or any subsequent party through improper handling? It certainly places it in the power of the State to most materially interfere with inter-

state commerce if it can prescribe that as a condition of its being carried on. The number of articles and the amount of interstate commerce thus subjected to the will of the State can scarcely be overestimated.

It is undoubtedly true that legislation should be had in respect to matters of this kind, but in my judgment such legislation can only come from Congress, and that body, and that body alone, can prescribe the conditions upon which commerce in these cattle can be carried on. Congress has legislated, but only partially, and the fact that its legislation does not go so far as in the judgment of the legislature of Kansas is required, is not, in my opinion, sufficient to warrant the State in enacting this statute. For these reasons, thus briefly stated, I am compelled to dissent from the opinion of the court.