ST. LOUIS SOUTHWESTERN RAILWAY COMPANY v. W. P. SMITH.

Decided February 18, 1899.

**1. Burden of Proof—Unconstitutionality of Statute.**

The burden of proof is upon a party attacking a statute on the ground of its unconstitutionality to clearly point out the vice.

**2. Live Stock Quarantine Regulations.**

Quarantine regulations duly promulgated by the State Live Stock Sanitary Commission have the force and effect of laws.

**3. Same—Presumption in Favor of.**

It will be presumed that the State Live Stock Sanitary Commission exercised proper judgment and discretion in adopting and putting into effect quarantine regulations excluding cattle from another State because of infectious and contagious diseases.

**4.  Same—Constitutionality—Interstate Commerce Clause.**

The Texas Live Stock Law (Revised Statutes, title 107, chapter 7) and proper regulations thereunder of the State Live Stock Sanitary Commission are not violative of the interstate commerce clause (section 8, article 1) of the Federal Constitution.

**5.  Same—Liability of Common Carrier Released.**

A common carrier is not liable for its failure to deliver within this State cattle shipped from another State, where such delivery was forbidden by the live stock quarantine laws of Texas, and the shipper knew that such quarantine was in effect when he shipped the cattle.

APPEAL from Tarrant.  Tried below before Hon. IRBY DUNKLIN.

Sam H. West and Perkins, Gilbert & Perkins, for appellants.

Hendricks & Hendricks, for appellee.

CONNER, ASSOCIATE JUSTICE.—Appellee brought this suit to recover the value of certain cattle shipped from Plain Dealing, La., upon a through bill of lading to Fort Worth, Texas, alleging that appellant accepted the shipment under said bill from a connecting carrier at Texarkana, Texas, and carried the cattle to Fort Worth, where the freight was tendered to it, and delivery refused.

Appellant answered by general denial, and that at the time and long before said shipment, it was a violation of the quarantine laws and police regulations of the State of Texas to bring Louisiana cattle, such as these were, into Texas at that time, and pleaded the orders of the Live Stock Sanitary Commission, and the proclamation of the Governor putting same in force, relative to Louisiana cattle.  That appellant had no actual knowledge of said orders and proclamation, and only the same constructive notice as the general public had by the publication thereof in the daily papers, but that appellee not only had constructive notice, but actual notice of such orders and regulations before the shipment.  That appellant received the shipment at Texarkana, Texas, and carried them to Fort Worth, and, upon being there advised of the quarantine regulations, immediately asked, by telegraph, authority from the Live Stock Sanitary Commission for authority to deliver said cattle to consignee, which was refused.  That the cattle were returned to its connecting line at Texarkana, and by it carried to Plain Dealing, La., and there tendered to the consignor, who was still at that place, and who was one of the joint owners of the cattle, and who had gone from Fort Worth to Plain Dealing with a drove of Texas ponies to trade for cattle, and represented himself and the others interested in said shipment.  That appellee and his co-owners contributed to and brought about the damages they sustained, if any, by having said shipment made with knowledge and in violation of the said quarantine regulations.  That by the terms of the contract the damages for which appellant should be liable were such only as occurred on its own line, and that none occurred while the shipment was in its possession.  That by the terms of the contract it was agreed

that in case of total loss the value of the cattle at the time and place of shipment should be the measure of damages.

Appellee by supplemental petition alleged that the said quarantine regulations were in violation of section 8, article 1, of the Constitution of the United States, and the shipment was a continuous and interstate shipment; that the order of the Live Stock Sanitary Commission and the proclamation of the Governor fail to show that the cattle were affected with the disease quarantined against, and affirmatively alleged them to be sound and well, and incapable of communicating disease to other cattle.

The court held (1) that the said quarantine regulations are violative of section 8, article 1, of the United States Constitution, and therefore void, and no protection to appellant; (2) that the stipulation in the contract limiting damages, in case of total loss, to the value of the cattle at the time and place of shipment, is void; and (3) that appellee was entitled to recover their value at the place of destination, for which he gave judgment, and from which judgment this appeal is prosecuted.

There is no separate statement of facts. The findings by the court, and exhibit "A" called for therein, are as follows:

"1. I find that the shipment of cattle in controversy was upon a through bill of lading issued by the St. Louis Southwestern Railway Company, and that Plain Dealing, La., was the initial point of shipment, and Fort Worth, Tarrant County, Texas, the point of destination.

"2. The defendant, the St. Louis Southwestern Railway Company of Texas, connected with the former named railroad at Texarkana, Texas, and the cattle were delivered to defendant at Texarkana by the connecting line, and the same was a through and continuous shipment from said Plain Dealing, La., to place of destination.

"3. The bill of lading was executed on the 27th day of August, 1897, and the cattle reached Fort Worth on the evening of the 28th of said month, and upon their arrival the owners were ready to receive the same, and the said owners at Fort Worth, Texas, tendered the amount of freight, to wit, $50, to the defendant railroad company, and demanded the cattle, and the said tender of freight charges and demand for the delivery of the cattle at Fort Worth, Texas, was refused by defendant.

"4. The cattle remained in the pens of defendant until August 31, 1897, and the stock yards at Fort Worth refused to receive said cattle in their pens, on account of the proclamation of the Governor of Texas quarantining Louisiana cattle, and defendant also made application to the Live Stock Sanitary Commission of Texas for permission to deliver said cattle to the owners thereof, and on account of the Governor's proclamation against Louisiana cattle the same was refused, and thereafter said defendant shipped said cattle back to Texarkana, Texas, and there delivered them to the line of railway from which defendant received them, which line returned said cattle to Plain Dealing, La., and there tendered said cattle to the shippers, who refused to receive them, and said line, after properly advertising them at the place from which they were

received, sold said cattle and tendered $299.20, the proceeds thereof, less pasturage at Plain Dealing, La., to the owners of said cattle. which also was refused.

"5. At the time said cattle were received at Plain Dealing, La., and at the time of their arrival at Fort Worth, and the tender of the freight charges made to defendant by the owners of the cattle, the Live Stock Sanitary Commission had recommended the adoption of the following regulations with reference to Louisiana cattle:

" 'The Texas Live Stock Commission has reason to believe that charbon or anthrax has or is liable to break out in the State of Louisiana, and from this time forth until the 15th day of November, 1897, no cattle, mules, or horses are to be transported or driven into the State of Texas from the State of Louisiana.'

"And C. A. Culberson, Governor of Texas, on the 5th day of June, 1897, in conformity with law, regularly promulgated said order and regulations of said commission by proclamation (a full copy of which is hereto attached and made a part hereof), and the quarantine hereby established against cattle in Louisiana was in full force at the time of the shipment in question, if the same was a valid quarantine regulation.

"6. The bill of lading under which said cattle were shipped contained the following stipulations:

" 'That in case of a total loss of any of the live stock covered by this contract, for any cause for which the first party will be liable, payment thereof will be made on the basis of the actual cash value at the time and place of shipment, but in no case to exceed $100 for each horse, pony, gelding, mare, stallion, mule, or jack; $50 for each ox; $30 for each cow; $10 for each calf or hog; $3 for each sheep or goat, and in case of injury or partial loss, the amount of damages claimed was not to exceed the same proportion.'

"The contract for the shipment of said cattle was in writing and signed by the carrier and also by R. F. Miller, shipper, who acted for himself and as agent for the other owners of the cattle shipped, and among other things said contract contains the following agreement:

" 'That for the consideration and for the covenants and conditions therein contained, the said first party (meaning the initial carrier) will transport for the said second party, the live stock described below, and the parties in charge thereof as hereinafter provided, viz.: One car said to contain forty-six head of stock cattle from Plain Dealing, La., station to Fort Worth station consigned to W. P. Smith, at the rate of $50 per car from Plain Dealing, La., to Fort Worth, Texas, subject to the minimum weights and length of car specified and provided for in tariff; said rate being less than the rate charged for shipments transported at carrier's risk. For which reduced rate and other considerations, it is mutually agreed between the parties hereto as follows:

" 'First. It is mutually agreed that if the destination of such cars be beyond the line of the initial carrier, then said initial carrier agrees. and it, and each connecting carrier in turn, is hereby authorized to deliver

said cars to its connecting carrier for transportation under the terms, stipulations, limitations, and agreements herein contained, and each and every carrier receiving said cars for transportation shall be deemed to adopt the terms and conditions hereof, and assume the like liabilities, and shall be entitled to all the provisions, exemptions from, and limitations of liability, and other stipulations, covering the measure and adjustment of damages herein contained.'

"I further find that said cattle were traded for in exchange for horses and mules, no money being paid for them; and were shipped after the promulgation establishing the quarantine regulations above mentioned.

"7. All the interest of the shippers and owners of said cattle and proceeds thereof, and all the claims arising out of the transactions involved in this suit, had been transferred before suit by the respective owners of said cattle, to wit, S. P. Clark, W. A. Maddox, H. P. Miller, J. S. Collier, and J. A. J. Reeves, to the plaintiff herein, and he is now the owner of all the claims arising therefrom, and said cattle were Louisiana cattle traded for in and around Plain Dealing, La., and at the time they were received by defendant at Texarkana, defendant had no actual notice of the orders of the Live Stock Sanitary Commission and the Governor's proclamation, but the owners of said cattle did have actual knowledge of the promulgation of the above mentioned proclamation by the Governor.

"8. It is agreed in this cause by written agreement on file that there were forty-six head of cattle comprehended in this shipment, of age and character as follows: Eighteen cows, six of which had calves following them; seven one-year-old steers; three heifers two years old each; six two-year-old steers; one heifer one year old; one bull two years old; one bull three years old; and one four years old; and two three-year-old steers. And I further find that the actual fair market value of said cattle at the time of their arrival at Fort Worth, and the refusal of the tender of the freight charges, in the Fort Worth market, was the sum of $610. And I further find that the amount of freight due defendant is the sum of $50.

"9. The actual cash fair market value of said cattle at the time and place of shipment, to wit, Plain Dealing, La., was the sum of $299.20.

"10. Defendant railway company and its connecting line at Texarkana are common carriers for hire."

The proclamation of the Governor, exhibit "A" referred to, is as follows:

"Whereas, the Live Stock Sanitary Commission of Texas has this day recommended the adoption of the following regulations:

" 'The Live Stock Sanitary Commission of the State of Texas have been reliably informed that the cattle, mules, and horses in the southern portion of Jefferson County, State of Texas, are affected with disease, known as charbon or anthrax, and are liable to impart such disease to cattle, mules, and horses ranging in upper portion of Jefferson and other counties, from this time forth to the 15th day of November, 1897, no cattle, mules, or horses are to be transported or driven north or west of

Taylor and Salt bayous, said bayous running across the southern portion of Jefferson County, State of Texas. This order is given for the purpose of quarantining all cattle, mules, and horses south and east of said Taylor and Salt bayous. The Texas Live Stock Commission has reason to believe that charbon or anthrax has or is liable to break out in the State of Louisiana. From this time forth until the 15th day of November, 1897, no cattle, mules, or horses are to be transported or driven into the State of Texas from the State of Louisiana. The Live Stock Sanitary Commission of the State of Texas hereby order that any violation of any of the aforesaid rules and regulations by moving of any cattle, mules, or horses north of said bayous, or out of Louisiana into the State of Texas is contrary to said rules and regulations, and shall be an offense and punishable as provided by the laws of the State of Texas.'

"Now, therefore, I, C. A. Culberson, Governor of Texas, in conformity with the provisions of chapter 7, title 102, of the Revised Statutes of Texas of 1895, do hereby declare that the quarantine lines, rules, and regulations set forth in the above recited order of the Live Stock Sanitary Commission of Texas, shall be in full force and effect from and after this date.

"In witness whereof I have hereunto set my hand, and caused the seal of the State to be affixed, at Austin, this 5th day of June, A. D. 1897.

"C. A. CULBERSON,
"Governor of Texas."

The trial court found the following conclusions of law:

"1. The quarantine regulations above mentioned established by the Governor of the State is a regulation of or an interference with interstate commerce, in that its effect is to prohibit the importation of all cattle from the State of Louisiana into the State of Texas, whether affected with or capable of communicating the disease mentioned in said proclamation or not, and is therefore void as being in contravention of section 8 of article 1 of the Constitution of the United States.

"Had the Live Stock Sanitary Commission of the State found upon investigation that charbon or anthrax had broken out among the entire cattle of the State of Louisiana, and that all cattle of the State of Louisiana were liable to communicate either of said diseases to cattle of the State of Texas, and had said proclamation of the Governor been based upon said finding, then I think it would have been in law a police regulation of no greater scope than necessary to the protection of cattle in the State of Texas, and therefore valid, even though it did interfere with interstate commerce.

"2. The stipulation in the contract of shipment limiting the damages in case of total loss of cattle to the actual cash value thereof at the time and place of shipment to a fixed sum per head is contrary to law and therefore void; the correct measure of damages in such cases being the reasonable market value of the cattle so lost at the point of destination.

"3. The plaintiff is entitled to recover of the defendant the sum of

$610, the value of the cattle lost by him at the time and place of destination, less the sum of $50, freight charges due defendant for said shipment, leaving a balance of $560, together with the interest thereon from August 28, 1897, up to the present time at the rate of 6 per cent per annum, making a total of $578.10, and judgment is rendered accordingly."

Appellant's first assignment of error is as follows: "The court erred in his first conclusion of law, in holding that 'the quarantine regulations above mentioned, established by the proclamation of the Governor of the State, is a regulation of or an interference with interstate commerce, in that its effect is to prohibit the importation of all cattle from the State of Louisiana into the State of Texas, whether affected with or capable of communicating the disease mentioned in said proclamation or not, and is therefore void, as being in contravention of section 8, article 1, of the Constitution of the United States.' "

It will be thus seen that we have before us an important question for solution. It involves the powers of the Governor and of the Live Stock Sanitary Commission of Texas, in so far as such powers relate to the protection or attempted protection of the live stock interests of this State; and also the question as to whether the regulation of said commission and the proclamation of the Governor in question were violative of section 8, article 1, of the Constitution of the United States. Under this assignment we will consider the questions in the order indicated.

In so far as necessary to be considered, our statutory provisions on the subject are as follows:

Revised Statutes, article 5043a, provides that "there shall be appointed by the Governor, and with the consent of the Senate, a Live Stock Sanitary Commission of the State of Texas, composed of three members." It is then provided that such commissioners shall take the usual oath of office, execute bond, and that the term of office shall be for a "period of two years," etc.

Article 5043c provides: "It shall be the duty of the commission provided for in article 5043a to protect the domestic animals of this State from all contagious or infectious diseases of a malignant character, whether said diseases exist in Texas or elsewhere; and for this purpose they are hereby authorized and empowered to establish, maintain, and enforce such quarantine lines and sanitary rules and regulations as they may deem necessary. It shall also be the duty of said commission to co-operate with live stock quarantine commissioners and officers of other States and Territories, and with the United States secretary of agriculture, in establishing such interstate quarantine lines, rules, and regulations as shall best protect the live stock industry of this State against Texas or splenetic fever. It shall be the duty of said commission, upon receipt by them of reliable information of the existence among the domestic animals of the State of any malignant disease, to go at once to the place where any such disease is alleged to exist, and make a careful examination of the animals believed to be affected with any such disease,

and ascertain, if possible, what, if any, disease exists among the live stock reported to be affected, and whether the same is contagious or infectious, and if said disease is found to be of a malignant, contagious, or infectious character, they shall direct and enforce such quarantine lines and sanitary regulations as are necessary to prevent the spread of any such disease. And no domestic animals infected with disease, or capable of communicating the same, shall be permitted to enter or leave the district, premises, or grounds so quarantined, except by authority of the commissioners. The said commission shall also, from time to time, give and enforce such directions and prescribe such rules and regulations as to separating, feeding, and caring for such diseased and exposed animals as they shall deem necessary to prevent the animals so affected with such disease from coming in contact with other animals not so affected. And the said commissioners are hereby authorized and empowered to enter upon any grounds or premises to carry out the provisions of this act."

In this connection it is important to observe that the first paragraph of this article makes it the duty of the commission to protect the domestic animals of this State from *all* contagious or infectious diseases of a malignant character, whether said diseases exist in Texas or elsewhere, and for that purpose it is empowered to establish and maintain such quarantine lines, rules, and regulations as it may deem necessary.

It is important also that it be observed that the duty and power thus imposed is *general* in its scope, and that the time when and manner in which this duty and power is to be exercised are not defined in the statute, nor any rules or regulations prescribed. The commissioners may establish such lines and such rules and regulations as *they* "may deem necessary." So that in all respects the duty and the power is general, and the time and manner of its performance is left with the commissioners.

It is to be noted also that the duty and power above noted is to be distinguished from that indicated in the succeeding paragraphs of the statute. The second paragraph declares it to be the duty of the commissioners to co-operate with like commissioners of other States or Territories and of the United States in establishing such quarantine lines, rules, and regulations as shall best protect the live stock industry of this State against *Texas* or *splenetic fever*. The next or third paragraph declares it to be the duty of said commission, upon receipt of reliable information of the existence among the domestic animals of *this State* of disease, to go and investigate, and if disease be found, to establish quarantine lines, etc., so as to prevent the spread of it.

Article 5043i, Revised Statutes, is as follows: "The Live Stock Sanitary Commission shall have power to call upon any sheriff, deputy sheriff, or constable to execute their orders, and such officers shall obey the orders of said commissioners; and the officer or officers performing these duties shall each be entitled to two dollars and fifty cents per day for himself and horse, which payment shall be made upon a sworn ac-

count, approved by said commissioners; provided, said expenses under this article shall not exceed in any event five hundred dollars per annum."

Article 5043k is as follows: "Any quarantine line that may be fixed by the Live Stock Sanitary Commission, against Texas or splenetic fever, shall be so fixed as to conform to the Federal quarantine line established, or that may be established, by the United States Department of Agriculture; provided, however, that as to the shipment or movement of live stock within the limits of the State, such quarantine lines, and the regulations in relation thereto, shall not apply from the first day of November to the fifteenth day of May of each year; provided, the quarantine line now recognized and established by Federal authority within the State of Texas shall not be changed prior to December 1, 1893, but said line as is now established shall remain in full force until said date."

Then our law provides appropriate penal provisions for violations of quarantine laws.

It is universally conceded that the power to pass proper quarantine laws is among the powers resrved to the several sovereign States of this Union. As was said by Chief Justice Marshall in speaking of inspection laws in the case of Gibbons v. Ogden, 9 Wheat., 203: "They form a portion of that immense mass of legislation which embraces everything within the territory of a State not surrendered to the general government; all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike roads, ferries, etc., are component parts of this mass." As was said in that case, "that such laws [inspection laws in that case] may have a remote and considerable influence on commerce will not be denied; but that the power to regulate commerce is the source from which the right to pass them is derived, can not be admitted." Again, as was said by the court in Thorpe v. Railroad, 27 Vermont, 149: "It extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property within the State. According to the maxim, 'Sic utere tuo ut alienum non laedas,' which, being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others."

This power has been exercised and upheld in a great variety of cases, and is so well established that we think it will be unquestioned, and extended discussion is therefore unnecessary. Crowley v. Christensen, 137 U. S., 86; Lawton v. Steele, 152 U. S., 136; Slaughter House Cases, 16 Wall., 36; Patterson v. Kentucky, 7 Otto, 501; Morgan v. Louisiana, 118 U. S., 455; Railway v. Haber, 169 U. S., 613.

The difficulty in the present case arises in the application of the general rule, for it must be conceded that "while a State may enact sanitary laws, while, for the purpose of self-protection, it may establish quarantine and reasonable inspection regulations, while it may prevent persons and animals suffering under contagious or infectious diseases from enter-

ing the State, it can not interfere with transportation into or through its borders, beyond what is absolutely necessary for its self-protection." Railroad v. Husen, 95 U. S., 465; Brunner v. Rehman, 138 U. S., 78; Scott v. Donald, 165 U. S., 178, 180.

The question is not free from difficulty. It is often a matter of great perplexity to undertake to trace the sometimes shadowy line between the lawful exercise of the police power of the State and the conceded power of Congress "to regulate commerce with foreign nations, and among the several States and with the Indian tribes." However, when a statute or police regulation, such as a quarantine line and regulations duly promulgated by the legally constituted authority, is attacked on the ground of its unconstitutionality, we think the burden is entirely upon the party insisting on its invalidity to clearly point out its vice. Courts have uniformly refused to declare a law or lawful regulation of the legislative body unconstitutional, except when impelled thereto by the clearest reason.

The real question arising under this assignment of error is, has it been shown clearly that the quarantine regulations in question are violative of the section of the Constitution cited? Has it been clearly shown that such regulations were in fact an unnecessary invasion of the power of Congress to regulate commerce between the States?

We have seen that quarantine laws and inspection laws often more or less directly affect interstate commerce, but that fact alone will not justify the inference that the quarantine regulations in question were an unwarranted exercise of the inherent police power of Texas to protect the property of her citizens. Holden v. Hardy, 169 U. S., 365, and authorities cited.

The mode in which these regulations were put in force, if at all, is not attacked; that is, it is not questioned that a State may lawfully empower her Governor to appoint a commission to whom shall be committed the power of determining the necessity for quarantine regulations and of prescribing the rules necessary to make them effective. In this case it is unquestioned that such a commission was appointed, that they declared the quarantine in question, and that it was duly promulgated by proclamation of the Governor. These regulations are only questioned because of their alleged infringement of the Constitution.

We think reflection will convince the reasonable mind that a large discretion must necessarily be given a commission of this kind in determining the state of facts rendering a quarantine necessary in the protection of life or property in the State, and the time when such quarantine should be declared. No legislative act could provide for every contingency rendering necessary the exercise of the power to exclude persons or things whose introduction might prove destructive to the life or property of our citizens, and we have seen that our law has in fact vested in the sanitary commission appointed thereunder a very wide discretion; and we maintain that when that discretion has been called into exercise, and formal quarantine lines designated and the rules and regulations de-

clared that are to make it effective, such line and such regulations have all the force of law, and as such should be obeyed by every class of our citizenship, unless it plainly appear that the commissioners have ex-ceeded their powers.

The facts in this case are not disputed. The plaintiff sues as for a conversion, because of a refusal to deliver his cattle at Fort Worth. It it necessary to his recovery that he show that it was the *legal duty* of the defendant company to make such delivery. It is for the breach of this alleged duty he sues. Yet it nowhere appears from the record that before the quarantine line in question was established the sanitary commission did not make the most careful and thorough investigation into the necessity therefor, if, indeed, that matter could in any event be inquired into. So far as the record shows, every animal of the kind prohibited in the State of Louisiana may have been actually affected with charbon or anthrax, and it is conceded that this is a disease different from Texas or splenetic fever, and that it is contagious and infectious and of the most virulent character.

It was shown that appellee's vendors had actual notice of the quarantine, and that appellant had not. It was also shown that after such notice was brought home to appellant it sought permission of the sanitary commission to deliver the cattle. The sanitary commission ruled and ordered otherwise. It has been given power to make rules. It has the power to call upon the sheriff and peace officers to enforce them. It was the duty of such officers to obey the orders of such commission. Our law also provides heavy penalties for a violation of the rules and regulations of the sanitary commission.

In this attitude of the case appellee insists that it was the legal duty of appellant to deliver the cattle in question, and yet he did not even show that the very cattle for the value of which he sues were free from the disease mentioned. So far as the record before us shows, they may every one have been so affected. We are asked to presume to the contrary, and to presume that the action of the commission was not necessary as a precautionary measure; that their judgment and discretion had been wrongfully exercised. We think every presumption should be indulged in aid of the validity of the law.

It may be said that it is not a reasonable presumption that all Louisiana cattle were at the time affected with charbon or anthrax. This may be true. Yet we do not understand that such condition must exist in order to the validity of a restraining order in the form of a quarantine. If the disease is contagious and infectious, large proportions thereof may have been subject to the influences of the disease, and thereby liable to communicate it to cattle in Texas. From the record we do not know what was the condition in this respect at the time our sanitary commission declared "that charbon and anthrax had or was liable to break out in the State of Louisiana." The necessities of such cases often require prompt action. If too long delayed, the end to be attained by the exer-

cise of the power to declare a quarantine may be defeated and irreparable injury done.

It is a matter of common history that our State and other States almost annually quarantine against cities and even States in which may be raging some contagious and deadly disease. The result is often to absolutely restrict immigration for the time being from such infected districts. It may happen as a fact that a person seeking admission is not affected with the disease quarantined against, and has not been subject to contagion therefrom; yet, if he be from the State, city, or district against which there be the quarantine prohibition, he can not enter our State.

The Supreme Court of the United States have declared certain acts of States restrictive of immigration unconstitutional, but we have been unable to find where a quarantine regulation of the kind mentioned has been held to be an unwarranted exercise of power on the part of a State. If it should so happen, for instance, that the yellow fever was epidemic in the island of Cuba, it would not only be within the power, but also the duty, of our quarantine officers to quarantine against every man, woman, and child in that island,—in all cases, of course, under proper regulations. The object of all such laws is not to unnecessarily restrict immigration, nor to regulate commerce between the States. It is true, for the time being such laws may absolutely prevent immigration or the introduction of property from the prohibited district; yet the exercise of such a power is absolutely necessary to the protection of life and property. It is a necessary incident of the law of self-defense. They are, and are intended to be, but temporary in character. The law in question was in no sense a regulation of commerce. It originated in a desire to protect the stock interests of Texas. It but provided for a suspension of the introduction of cattle, etc., for a very limited time.

Without further argument or citation of authority, our conclusion is that this case should be reversed and rendered for appellant, and it is so ordered.

*Reversed and rendered.*