## PECOS & N. T. RY. CO. v. HALL.
### (No. 125–3004.)

(Commission of Appeals of Texas, Section A. May 26, 1920.)

1. **Commerce** ⊗⟹8(3)—**State cattle quarantine regulations held not in conflict with or superseded by federal regulations as to interstate shipment.**

State regulations for moving cattle from pasture in quarantined territory to station are not in conflict with, and so not superseded by, federal regulations, under the national quarantine act, relating solely to their movement in interstate shipment.

2. **Carriers** ⊗⟹215(1)—**Not liable for damage from dipping cattle because of advance notice that it would not transport them unless dipped, as required by quarantine regulations before taking them to station.**

Where plaintiff without dipping his cattle, in pasture in territory under quarantine, could not have taken them to defendant's station for interstate shipment, without violating quarantine regulations, defendant, because notifying plaintiff in advance that it would not transport them unless they were dipped, was not liable for the damage from dipping them, which plaintiff thereupon had done, irrespective of whether under regulations, under the national quarantine act, it would have been defendant's duty to receive them for shipment had they been moved and tendered for shipment without dipping.

Error to Court of Civil Appeals of Seventh Supreme Judicial District.

Action by J. F. Hall against the Pecos & Northern Texas Railway Company. Judgment for plaintiff was affirmed by the Court of Civil Appeals (189 S. W. 535), and defendant brings error. Reversed and rendered.

Terry, Cavin & Mills, of Galveston, and Madden, Trulove, Ryburn & Pipkin, of Amarillo, for plaintiff in error.

R. R. Hazelwood and J. M. Jones, both of Amarillo, for defendant in error.

TAYLOR, J. J. F. Hall early in October, 1913, entered into a contract with Warren & Son, ranchmen, by which he agreed to take from them all their heifers of a certain class, less a 10 per cent. cut back. The cattle were located on a ranch in Parmer and Bailey counties, Tex., and by the terms of Hall's contract of purchase were to be by the owners rounded up at Cyclone Well, where Hall was to make his cut back. Following this, the cattle to be received by Hall were to be taken to Bovina, a station on the Pecos & Northern Texas Railway Company's line about five miles from Cyclone Well, and there delivered to Hall on October 24th. Hall was purchasing the cattle for shipment from Bovina to Kansas City for immediate slaughter,

---

⊗⟹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

and on October 14th ordered cars in which to move the shipment on the 24th.

The territory, including all of Bailey and Parmer counties, as well as the ranch upon which the cattle were located, was then under quarantine established by both state and federal authorities on account of the prevalence of a disease known as scabies.

On October 22d, before the cattle were to be rounded up for Hall to make his cut back, L. L. Jones, an inspector for both the Live Stock Sanitary Commission of Texas and the Bureau of Animal Industry for the federal government, informed the station agent at Bovina, John Lucas, that he would not issue a shipping permit for the cattle, unless they were dipped. Lucas thereupon communicated by wire with the company's general freight agent, and was advised not to receive the cattle for transportation unless they were accompanied by a shipping permit. Following this, Lucas attempted to get in telephone communication with Warren & Son's foreman, Mr. Morehead, for the purpose, according to his statement, "of not having him go to the trouble of bringing in the cattle without knowing they would be clear for shipment." Lucas failed to get in communication with Morehead, but later in the day talked to Inspector Jones, who volunteered his services in the matter of either seeing Morehead direct, or sending him word that Lucas would not receive the cattle for shipment until a permit had been issued. Morehead testified that he received the message from Jones that the cattle would not be received for shipment until they had been dipped. For that reason, he testified, he did not take the heifers to Bovina on the 24th for delivery. The night following the conversation between Jones and Morehead the latter talked with Hall over the telephone, with the result that the cattle were dipped the next day under Hall's instructions. A shipping permit was issued, and on October 31st the cattle were delivered to Hall at Bovina, and by Hall to the railway company, and shipped.

Hall sued the railway company for the damages sustained by the cattle resulting from the dipping. He states in his first supplemental petition that the gist of his cause of action "is the unlawful, illegal, and negligent requirement by the defendant that plaintiff procure a certificate of the inspection and permit, which would require dipping of the cattle in question before it would accept them for shipment."

Rule 19 of the Live Stock Sanitary Commission of Texas, promulgated under the quarantine laws of the state, and in force at the time of the transactions above detailed, recites that, whereas it had been ascertained by the Live Stock Sanitary Commission that scabies, a contagious, communicable disease, was prevalent among the cattle in the counties named, including the counties of Parmer and Bailey, that to the end the disease be eradicated from among the cattle of Texas, the movement of any cattle from, through, or into the counties named should be made in the manner and under the conditions thereafter prescribed.

The conditions prescribed by rule 20 of the commission were, in effect, that no cattle held in the counties named should be moved from the pastures where located for any purpose whatsoever without a permit issued by a duly authorized inspector of the commission, and that no cattle within the territory designated should be tendered for inspection to a federal inspector for interstate movement, unless the owner of the cattle was in possession of a certificate signed by an inspector for the commission, stating that the owner of the cattle tendered had complied wih the state laws, rules, and regulations of the commission, and that his range and cattle were free of infection.

Regulation No. 21 of the Bureau of Animal Industry for the federal government, promulgated and in force at the same time, provides that cattle not visibly diseased, but which may be part of a diseased herd, may, without inspection, be shipped interstate as "uninspected exposed cattle" for immediate slaughter, from points in the quarantined area to any recognized slaughtering center where pens were provided for yarding exposed cattle, provided the officers of the transportation company fixed to both sides of the cars carrying such cattle a durable placard on which was printed in the type prescribed the words, "uninspected exposed cattle." Plaintiff contended that, inasmuch as his cattle were of the class designated, they were eligible to shipment under the federal regulation, without dipping and without the issuance of a certificate or permit.

The court received in evidence the rules of the Live Stock Sanitary Commission offered by defendant, but after the evidence was concluded withdrew them from the consideration of the jury. The charge was, in substance, that if the cattle were uninspected exposed cattle, but not diseased, and plaintiff ordered cars for their transportation on October 24th from Bovina to Kansas City for immediate slaughter, and that prior to the time for shipment defendant announced it would not receive and transport the cattle without a certificate or permit, or unless they were first dipped, and that such announcement, if any, was communicated to plaintiff, and that the only lawful way by which a shipping permit or certificate could be obtained was for the cattle to be dipped, and that in compliance with the announcement the cattle were dipped, and from the dipping as a proximate cause sustained the injuries alleged, to find for plaintiff.

The trial resulted in a verdict and judgment for plaintiff. The Court of Civil Appeals affirmed the judgment. 189 S. W. 535. The writ was granted upon application referred to the committee of judges.

[1] Plaintiff seeks to predicate liability upon the station agent's statement that he would not receive the cattle for transportation unless they were dipped and the subsequent act of dipping resulting in their injury, and attempts to discharge the burden of showing that plaintiff could have lawfully tendered the cattle for shipment without dipping on the date the cars were due to be furnished at Bovina, by invoking federal regulation No. 21.

The difficulty arises from the fact that at the time of the agent's statement, by which it is claimed he waived the company's right to an actual tender of the cattle for shipment, they were in the custody of Warren & Son in their pasture several miles distant from Bovina. They were at that time also a part of a diseased herd in infected territory, and had not been tendered to a federal inspector for interstate movement; nor had a permit or certificate been issued preliminary to such movement, as required by the state quarantine rules.

Defendant in error questions the validity of the state rules, and points out that in 1905 Congress enacted sections 8703, 8704, U. S. Comp. Stats. 1916, relating to the interstate shipment of diseased and exposed cattle from quarantine districts; that under section 8703 it is the duty of the Secretary of Agriculture to promulgate rules and regulations governing the inspection, certification, treatment, handling, and the method and manner of delivering and shipping of cattle from a quarantined state, or any portion thereof, into any other state; that section 8704 provides that cattle may be moved from such area in compliance with the rules and regulations promulgated pursuant to the provisions of section 8703, and that cattle may lawfully be moved only in compliance with the rules and regulations so promulgated. The contention is made that upon such enactment by Congress the national quarantine laws superseded those of the state.

The state quarantine laws and regulations are superseded by the federal only in case of conflict, or in the event the state rules are unreasonable and impose a direct burden upon interstate commerce. St. L. S. W. Ry. Co. v. Smith, 20 Tex. Civ. App. 451, 49 S. W. 627; Id., 181 U. S. 248, 21 Sup. Ct. 603, 45 L. Ed. 847; Evans v. Chicago & N. W. Ry. Co., 109 Minn. 64, 122 N. W. 876, 26 L. R. A. (N. S.) 278; Hannibal & St. J. R. Co. v. Husen, 95 U. S. 465, 24 L. Ed. 527; Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 455, 3 Interst. Com. Com'n R. 185; Missouri, K. & T. R. Co. v. Haber, 169 U. S. 613, 18

Sup. Ct. 488, 42 L. Ed. 878; Rasmussen v. Idaho, 181 U. S. 198, 21 Sup. Ct. 594, 45 L. Ed. 820. Whether the state and federal regulations are in conflict must be determined by reference to the regulations themselves.

The federal regulation invoked relates wholly to safeguards provided to prevent the spread of the disease after the cattle have been received by the carrier and are in the process of interstate shipment. State rules Nos. 19 and 20 have to do with precautions to be exercised in moving the cattle from the pastures in which located, and the tendering of them to a federal inspector for interstate movement. They are supplemental rather than in conflict.

The state's jurisdiction over its exports until they are committed to the carrier for transportation when they are to be transported by rail, and, in any event, until they are started upon their ultimate passage from the state, is recognized by both the federal and state decisions.

In Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715, the court say:

"When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepôt for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state. Until then it is reasonable to regard them as not only within the state of their origin, but as a part of the general mass of property of that state, subject to its jurisdiction."

The doctrine stated has been reaffirmed in the recent cases of McCluskey v. Marysville & Northern Ry. Co., 243 U. S. 36, 37 Sup. Ct. 374, 61 L. Ed. 578, and Hammer v. Dagenhart, 247 U. S. 272, 38 Sup. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724. In Houston Direct Navigation Co. v. Insurance Co. of North America, 89 Tex. 1, 32 S. W. 889, 30 L. R. A. 713, 59 Am. St. Rep. 17, it is held that when a commodity has been delivered to a common carrier to be transported on a continuous voyage to a point beyond the limits of the state where delivered, the character of interstate or foreign commerce attaches thereto.

The mere fact that the National Quarantine Act provides for the interstate movement of cattle only by rules and regulations promulgated under its provisions does not render void reasonable state regulations touching their preliminary movement, at least in the absence of conflicting regulations; nor are such state regulations thereby rendered void so long as the national regulations relate solely to cattle in the process of interstate shipment.

In the recent case of Carey v. State of South Dakota, 250 U. S. 118, 39 Sup. Ct. 403, 63 L. Ed. 886, the court had under consideration the validity of the State Game Laws of South Dakota. The question involved was whether the state law, in view of the provisions of the federal Migratory Bird Act, enacted subsequent to its passage, was void. The federal act provides that all wild geese, wild ducks, and other migratory birds which in their migration passed through and did not remain permanently the entire year within the borders of any state should thereafter be deemed to be within the custody and protection of the government of the United States, and should not be destroyed or taken contrary to regulations thereinafter provided for. The state law provided that no person should ship, convey, or cause to be shipped or transported, by common or private carrier, to any person either within or without the state, wild duck of any variety. Carey was convicted in the state court for violation of the state statute under a charge of shipping wild ducks from a point within the state to Chicago. He urged that, inasmuch as Congress by the language of the national act assumed exclusive jurisdiction over the class of migratory birds in question, the then existing state laws on the subject were thereby abrogated. The court in the course of the opinion upholding the validity of the state law say:

"It is, however, urged that Congress has manifested its intention to assume exclusive jurisdiction of the subject, and that the failure to make any provision in the federal act concerning shipping evidences the purposes of Congress that the shipping of game birds shall not be prohibited. This argument rests upon the clause which declares that the migratory birds 'shall hereafter be deemed to be within the custody and protection of the government of the United States.' But that clause may not be read without its context; and the words immediately following show that the custody and protection is limited to prohibiting their being 'destroyed or taken contrary to regulations' which are to fix the closed seasons in the several zones. If, reading the federal act as a whole, there were room for doubt, two established rules of construction would lead us to resolve the doubt in favor of sustaining the validity of the state law. First. The intent to supersede the exercise by a state of its police powers is not to be implied unless the act of Congress, fairly interpreted, is in actual conflict with the law of the state. Savage v. Jones, 225 U. S. 501, 533; Missouri, Kansas & Texas Ry. Co. v. Haber, 169 U. S. 613, 623. Second. Where a statute is reasonably susceptible of two interpretations, by one of which it would be clearly constitutional and by the other of which its constitutionality would be doubtful, the former construction should be adopted."

[2] The state quarantine regulations are, in our opinion, valid, and must be looked to in determining in the light of the facts whether plaintiff, at the time he claimed the railway company waived its right to have the cattle actually tendered for shipment, was in a position to lawfully tender them for transportation without having them dipped.

Judge Hendricks, speaking for the Court of Civil Appeals in this case, says:

"We necessarily infer that the jury believed that Jones, as federal inspector, informed Lucas, the agent, that under the federal regulations these particular cattle, purchased by Hall, had the right to go to Kansas City, Mo., for immediate slaughter. If under the federal regulations a permit for that purpose was necessary to be issued by Jones, it inferentially follows that Jones, as federal inspector, would have issued such a document. It also follows, we think, logically that the agent had no right to refuse to receive uninspected, clean cattle in the pens at Bovina for shipment for immediate slaughter at Kansas City and St. Joseph, Mo., unless the same were dipped. We infer that Jones, as state inspector, would not have issued a permit for the movement of these cattle from Warren & Son's ranch to the stock pens, but also conclude that, if a permit were necessary, he would have issued one as federal inspector, permitting the movement of the cattle to Kansas City and St. Joe, Mo., for the open market for immediate slaughter."

The inference relied upon in the foregoing excerpt cannot be indulged except upon the presumption that the inspector would have violated his official duty.

Under the provisions of rule 20 of the state live stock commission, only two ways were open to plaintiff for moving his cattle from the pasture where located, to wit: (a) By securing a certificate from the inspector stating that the owner of the cattle tendered and complied with the state laws, rules, and regulations, and that his range and cattle were free of infection; and (b) by securing a permit from the inspector. Jones stated to the station agent that the cattle "were not eligible to a certificate," and it appears from the rule that they were not. The range was not free from infection, and it is not to be inferred that a certificate would have been issued so stating. There is no basis in the record for indulging the inference that the inspector would have issued a permit to move the cattle without their being dipped, even if his statement that under the state regulations the cattle "couldn't come from the range without dipping" be disregarded. There is no ground for presuming that protection of the territory between the pastures and the shipping points, from the spread of disease therein, was not equally as important as protecting the territory along the route of shipment from the same menace.

We see nothing in the state rules to indicate that they are unreasonable, or that they were not promulgated in good faith for the protection of the live stock of the state.

Plaintiff, without dipping his cattle, could not have moved them from the pasture where located to Bovina, without violating the state quarantine regulations; and, regardless of whether after the cattle had been so moved it would have been the defendant's duty under federal regulations, to receive them for transportation without dipping, plaintiff is not entitled to recover. A cause for damages could not be founded, we think, upon an advance notice given by the defendant to the plaintiff that it would not transport the cattle unless they were dipped, when in fact the plaintiff could not have tendered the cattle lawfully for shipment without dipping them. There was no waiver by defendant of a tender which plaintiff was not in position to make.

We recommend, therefore, that the judgments of the district court and Court of Civil Appeals be reversed, and that judgment be rendered in favor of plaintiff in error.

PHILLIPS, C. J. We approve the judgment recommended in this case.