[S. F. No. 14814. In Bank.—May 1, 1933.]

DUDLEY MOULTON, as Director of Agriculture, etc., Respondent, v. WILLIAMS FRUIT CORPORATION (a Corporation), Defendant; AMERICAN SURETY COMPANY OF NEW YORK (a Corporation), Appellant.

Joseph G. DeForest for Appellant.

R. P. Wisecarver, Redman, Alexander & Bacon, Hartley F. Peart and Horace W. B. Smith as *Amici Curiae* on Behalf of Appellant.

U. S. Webb, Attorney-General, Frank English, Deputy Attorney-General, and C. J. Carey for Respondent.

PRESTON, J.—This appeal arises from a judgment entered November 23, 1931, for $5,000 in favor of plaintiff and against defendants, based upon a written stipulation of facts, having certain exemplars thereto attached.

Plaintiff is the Director of Agriculture of the State of California and acts in the premises in behalf of five certain grape growers of the state who claim to be creditors of defendant fruit corporation. This corporation defaulted and defendant surety corporation alone questions the judgment.

The facts are that defendant fruit corporation, during the grape season of 1928, entered into separate written contracts with each of said growers to handle on consignment all their grape crops for said season. The contracts were of the same general form, an illustration of a portion of one of them being as follows: "Contract. Parties: Williams Fruit Corporation, Shipper, Vida M. Martin, Grower. It is mutually agreed: The Grower hereby places on consignment with shipper the entire crop of muscats (season of 1928) consisting of 16 acres, more or less, grown . . . at or near Selma . . . delivery point, shippers' packing house . . . Selma . . . $15.00 per ton guarantee. . . . "

The fruit corporation in due course received the grape crops and marketed them admittedly to the best advantage but it failed to realize a net return sufficient to cover the guaranty specified and, in so doing, it is admitted that the fruit corporation was guilty of no negligence, deceit or bad faith in the matter but on the contrary secured the best price the market afforded and did not even deduct its commissions but returned the full avails to the growers.

The growers, however, standing on their above-mentioned guaranty, claimed to be creditors in an amount aggregating more than $5,000; they complained to the Director of Agriculture, who made unsuccessful demands upon defendants and this suit followed.

The action arises under the Statutes of 1927, chapter 860 (p. 1812 et seq.), in effect July 21, 1927. Under this act defendant fruit corporation applied for and obtained a license as a "produce dealer" and gave its bond in the sum of $5,000 as required by the act. Appellant became the surety thereon. The obligation of the bond followed the language of the act and so far as here material reads: "Now, Therefore, If said principal shall well and truly comply with the provisions of the act and shall faithfully and honestly handle farm products as such licensed produce dealer, until January 1, 1929, in accordance with the terms of said act and any and all amendments thereto, then this obligation is to be void; otherwise to remain in full force and effect. . . . "

The question we must solve is: Does the bond cover the cause of action here set forth? Plaintiff contends that the act expressly covers it in that the growers became creditors of the fruit corporation to the extent of $15 per ton for their grapes and, by not returning this sum to them, the corporation expressly violated the provisions of the act which required it to faithfully account to them for the net proceeds of sale of the crops. Plaintiff relies specifically on the provisions of section 5 of said act, that "said bond shall be conditioned upon compliance with the provisions of the act and upon the faithful and honest handling of farm products in accordance with the terms of this act. . . . In case of failure by a produce dealer to pay consignor creditors for farm produce received from said consignors to be sold, the state Director of Agriculture shall proceed forthwith to ascertain the names . . . of all consignor creditors . . . , together with the amounts due and owing to them . . . and shall request all such consignor creditors to file a verified statement of their respective claims. . . . Thereupon the state Director of Agriculture is hereby authorized to and shall proceed forthwith to bring an action on the bond in behalf of said consignor creditors which has been filed in the department by said produce dealer. . . . " Plaintiff also

relies on certain provisions found in sections 8, 9, 12 and elsewhere in said act, all of which by clear implication make it a violation thereof for a dealer to fail to account to a grower for the proceeds of the sale of produce received and marketed by such dealer.

Appellant contends that under the statement of facts here shown, however, neither deceit, fraud, wilful negli-gence nor any breach of the provisions of the act appear; that the transaction was, in effect, a sale by the grower to the dealer and the surety is not liable for the purchase price; that the grower, by accepting the guarantee over his signature and allowing a sale to be made thereunder, in effect extended credit to the produce dealer and the bond does not cover credit insurance; that by insertion of said guaranty, the contracts became in effect private contracts between the grower and the produce dealer for breaches of which the surety is not liable; lastly, that the provisions of the act providing for a suit by the Director of Agriculture are procedural only and do not fix the liability of the surety.

We are unable to come to any other conclusion than that the failure of the corporation to account to the growers to the extent of $15 per ton for their grapes was a clear violation of the terms of the act. The contract was one of consignment and not of sale. The presence of the guaranty did not alter its essential features. Title to the goods did not pass until sale was made by the factor (*Pugh* v. *Porter Bros.*, 118 Cal. 628 [50 Pac. 772]). The guaranty was but an inducement to the grower to enter into the contract.

The provisions of the act defining a produce dealer are very comprehensive and cover "one who shall receive produce for sale on commission or contract with the producer thereof for farm products to be sold by him on commission or accept in trust from the producer thereof for the purpose of resale . . . or who shall in any way handle for the account of or as an agent of the producer thereof any kind of farm products." (Stats. 1927, pp. 1812, 1813.) This definition seems clearly to be broad enough to authorize the contracts in suit.

If the fruit corporation had sold the grapes for $20 per ton, it would have been required to return to the grower the net amount based on such a selling price; if they had been sold for exactly $15 per ton, the corporation would

have been required to do the same thing; if sold for $10 a ton, the corporation would have been obliged to make up the deficiency. Such situations could easily be visualized by the surety as a result of the plain provisions of the act.

We attach no importance whatsoever to the contention that fraud, deceit or wilful negligence must be shown before a cause of action may arise under the act. It is true that such conduct authorizes a cause of action in any injured party but the act is much broader in its terms and expressly authorizes a suit by the Director of Agriculture in all cases where a dealer has failed to account to a consignor for the proceeds of produce sold and disposed of by him, thus violating the act.

The judgment is affirmed.

Langdon, J., Curtis, J., Shenk, J., Seawell, J., and Waste, C. J., concurred.

THOMPSON, J., Dissenting.—I dissent.

I cannot bring myself to agree with the prevailing opinion. In the first place, a reading of the Produce Dealers' Act (Stats. 1927, p. 1812 et seq.) clearly indicates that the bond was required to be furnished by the dealer in order to protect his consignors against dishonesty, fraud, deceit or wilful negligence. For instance, in section 5 we read as follows: "Said bond shall be conditioned upon compliance with the provisions of the act and upon the faithful and honest handling of farm products in accordance with the terms of this act." It is patent from a consideration of this language and the purpose to be served by the enactment of the measure, which latter fact is always to be considered in the interpretation of an act, that the legislature had in mind the protection of the consignors against the defalcations or fraudulent dealings of their consignees. Furthermore, section 11 of the act is illuminating. It reads: "It shall be the duty of every produce dealer, having received any farm products for sale as such dealer, to promptly make and keep a correct record showing in detail the following with reference to the handling, sale, or storage of such farm products: (a) The name and address of the consignor; (b) the date received; (c) the condition and quantity upon arrival; (d) date of such sale for account of consignor; (e) the price for

which sold; (f) an itemized statement of the charges to be paid by the consignor in connection with the sale; (g) each consignment of product shall be given a lot number or other identifying mark, which number or mark shall appear on all sales tags and/or on any other essential records needed to show what the produce actually sold for; (h) a detailed statement shall be kept on file of the filing of any claim or claims which have been or may be filed by the produce dealer against any person, firm, exchange, association or corporation for overcharges or for damages resulting from the injury or deterioration of such farm products by the act or acts or neglect or failure of such person, firm, exchange, association or corporation, and such records shall be open to the inspection of the state Director of Agriculture and the consignor or consignors of farm products for whom such claim or claims are made; *provided,* that the money returns, if any, collections, or damages received by said produce dealer from said persons, firms, exchanges, associations or corporations for and on behalf of consignor or consignors of farm products by reason of said overcharges, damages, or deterioration shall forthwith be paid to the aforesaid consignor or consignors of farm products, less charges for collection thereof in accordance with the schedule of charges filed under section 6 of this act. A copy of record and account of sales of farm products together with remittances in full of the amount realized by such sales, less the agreed commission and other charges, shall be delivered to the consignor upon the consummation of the sale together with all moneys received by him in payment for any consignment of farm products, less the agreed commission and other charges, within ten days after receipt of said moneys by said dealers, unless otherwise agreed in writing; *and provided, however,* that the names and addresses of the purchasers need not be given.

"It shall also be the duty of every produce dealer to retain a copy of all records including sales tags, account sales, and other records covering each transaction, for a period of one year from the date thereof, which copy shall at all times be available for, and open to, the confidential inspection of the state Director of Agriculture and the interested consignor or any authorized representative of either. In the event of any dispute or disagreement between a consignor and a prod-

uce dealer arising at the time of delivery as to condition, quality, grade, pack, quantity or weight of any lot, shipment or consignment of farm products, it shall be the duty of the state department of agriculture to furnish upon the payment of a reasonable fee therefor to be paid by requesting party a certificate establishing the condition, quality, grade, pack, quantity or weight of such lot, shipment or consignment, such certificate shall be *prima facie* evidence in all courts of this state as to the recitals thereof at the time such inspection was made. The burden of proof shall be upon the produce dealer to prove the correctness of his accounting as to any transaction which may be questioned.'' Manifestly the purpose of requiring the records to be kept in the manner outlined is that an examination will disclose whether there has been a failure to honestly account for the sales price. Section 12 of the act indicates a similar intent. It reads as follows: ''Any person, firm, exchange, association or corporation who shall assume or attempt to act as a produce dealer of farm products as defined by this act without a license, or any person, firm, exchange, association or corporation who, being a produce dealer of farm products, shall (a) impose false charges for handling or services in connection with farm products, or (b) fails to account promptly, correctly, fully and properly and to make settlement therefor as herein provided; or (c) shall intentionally make false or misleading statement or statements as to market conditions, or (d) shall make fictitious sales or shall be guilty of collusion to defraud the producer, or (e) shall directly or indirectly purchase for his or its own account, goods received by him, or it, upon consignment without prior authority from the interested consignor, or shall fail promptly to notify the consignor of such purchases, if any, on his. or its own account; *provided,* that this clause shall not be so construed as to prevent any produce dealer from taking to account of sales, in order to close the day's business, miscellaneous lots or parcels of farm products remaining unsold, if such produce dealer shall forthwith enter such transaction on his account of sales, or (f) shall intentionally make false statement or statements as to the grade, condition, markings, quality or quantity of goods shipped or packed in any manner or (g) shall fail to comply in every respect herewith, shall be guilty of a misdemeanor and, upon

conviction thereof, shall be punished by a fine of not to exceed one thousand dollars or by confinement in the county jail for not more than one year, or by both such fine and imprisonment. It is hereby made the duty of the several district attorneys of this state to prosecute all violations of this act subject to prosecution in their respective counties. Civil suits and criminal prosecutions arising by virtue of any of the provisions of this act may be commenced and tried in either the county where the products were received by the produce dealer, or within the county in which the principal place of business of such produce dealer is located within the state of California, or within the county in which the violations of this act occurred.'' The provisions of section 9 are to like effect.

And let us notice other language in section 5 as follows: ''Any consignor of farm products claiming to be injured by the fraud, deceit or wilful negligence of any produce dealer may bring action upon said bond against both principal and surety in any court of competent jurisdiction to recover the damages caused by such fraud, deceit and wilful negligence, or the failure to comply with this act.'' It is possible that if the consignee failed to keep the records provided for in section 11 damages might possibly flow to the consignor. But I find nothing in the act which requires the broker to be able to fulfill his ordinary and general contractual obligations. The whole interest and purpose is to protect against trickery, chicanery and dishonesty—but there is nothing to indicate a desire on the part of the legislature that the surety should be required to underwrite the financial ability of the produce dealer. As stated in the opinion of the court, it is admitted that there was no negligence, deceit or bad faith on the part of the fruit corporation. Hence it was without the scope of the bond which was given in accordance with the requirements of the act.

Rehearing denied.

Thompson, J., dissented.