## State and Federal Control of Milk Prices and Practices

Coho, Deputy Attorney General, April 16, 1942.— You have asked us for our opinion concerning the power and authority of the Milk Control Commission in the Philadelphia milk marketing area as the result of Federal price regulation in that area under the Agricultural Marketing Agreement Act of 1937 and its amendments.

You state that during the spring and summer of 1941 the Inter-State Milk Producers Coöperative, Inc., petitioned the Milk Control Commission, under the Milk Control Law, for hearings to increase minimum prices to be paid to producers for milk by dealers. On July 25, 1941, official general order no. A-73 of the commission increased minimum prices to be paid producers. Not satisfied with this increase, the producers demanded a further hearing, which was held October 15, 16, 17, and 18, 1941. They also petitioned the Secretary of Agriculture of the United States for a hearing under the Agricultural Marketing Agreement Act of 1937 and its amendments. After correspondence between the United States Department of Agriculture and the commission, it was agreed that a joint hearing would be held by the commission and a hearing officer appointed by the Department of Agriculture. Accordingly, a joint hearing, beginning October 23, 1941, and ending December 5, 1941, was held in Philadelphia to hear testimony on

costs and other matters relating to the production and distribution of milk for the Philadelphia milk marketing area. Meanwhile, the commission promulgated and Governor James approved official general order no. A-79, which again raised minimum prices to be paid producers for milk. The two increases raised minimum prices to be paid producers for milk used for consumption in fluid form from $2.98 to $3.58 per hundredweight. The retail price to consumers for market milk advanced under the two orders from $0.12 to $0.14 per quart.

The commission has found from its consideration of the record at the joint hearing that no change in the present order should be made. The Federal Secretary of Agriculture has promulgated a tentative order fixing prices to be paid producers for milk handled in the Philadelphia milk marketing area. You state that this proposed order has been approved by the required number of producers and has been made effective on April 1, 1942. You ask whether this order has limited the powers of the Milk Control Commission in the Philadelphia area, and if so, to what extent.

Several matters are involved: (1) Minimum prices to be paid producers for milk; (2) minimum prices to be charged consumers for milk; (3) maximum prices to be charged consumers for milk; (4) licensing of milk dealers; (5) bonding of milk dealers; (6) records and reports of milk dealers and trade practices.

1. *Minimum Prices to be Paid Producers for Milk.*

The order of the Secretary of Agriculture of the United States regulating the handling of milk in the Philadelphia, Pa., milk marketing area, provides for the payment of minimum prices to producers for milk handled in the Philadelphia area. Part of this milk originates outside of Pennsylvania. This order has been promulgated by the Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act of June

3, 1937, c. 296, 50 Stat. at L. 246, as amended by the Act of August 5, 1937, c. 567, 50 Stat. at L. 563, the Act of April 13, 1938, c. 143, 52 Stat. at L. 215, and the Act of May 31, 1939, c. 157, 53 Stat. at L. 793, 7 U. S. C. sec. 608 et seq. The constitutionality of this act has been sustained by the Supreme Court of the United States: United States v. Rock Royal Coöperative, Inc., et al., 307 U. S. 533 (1939); H. P. Hood & Sons, Inc., et al. v. United States et al., 307 U. S. 588 (1939).

You have stated that about 30 percent of the milk handled in the Philadelphia area originates in other States, principally Delaware and Maryland, while the remainder is produced in Pennsylvania. The Federal act authorizes the Secretary of Agriculture to fix minimum prices to be paid producers for milk handled in the current of interstate or foreign commerce or which directly burdens, obstructs, or affects interstate or foreign commerce in milk. The power of the Secretary of Agriculture of the United States to regulate the handling of milk in the Philadelphia area includes the power to prescribe minimum prices to be paid producers for milk handled in the Philadelphia area that is produced in Pennsylvania as well as milk coming into that area from other States: United States v. Wrightwood Dairy Co., 315 U. S. 110, 62 S. Ct. 523, 86 L. Ed. 431 (1942); United States v. Adler's Creamery, Inc., 107 F.(2d) 987 (C. C. A. 2, 1939); Roloff et al. v. Perdue, 33 Fed. Supp. 513 (D. C., Iowa, 1940). The Secretary of Agriculture has apparently exercised that power.

Section 803 of the Pennsylvania Milk Control Law of April 28, 1937, P. L. 417, as amended by the Act of July 24, 1941, P. L. 443, 31 PS § 700j-101 et seq., provides for the fixing, by the Milk Control Commission, of minimum prices to be paid producers for milk. So long as the Secretary of Agriculture did not exercise his authority to regulate the prices to be paid producers for milk handled in the Philadelphia area, the Milk

Control Commission had authority to fix those prices: Milk Control Board v. Eisenberg Farm Products, 306 U. S. 346 (1939).

The Federal minimum price order supersedes the minimum price order of the Milk Control Commission regulating the same matter, and so long as the Federal order remains in effect the orders of the Milk Control Commission regulating the Philadelphia area are not enforcible as to minimum prices to be paid producers for milk: Cloverleaf Butter Co. v. Patterson, 315 U. S. 148, 62 S. Ct. 491, 86 L. Ed. 486 (1942). Of course, if the Federal order becomes inoperative the State order will again automatically become operative: New York Central Railroad Co. v. Public Service Commission of New York et al., 268 Fed. 558 (D. C., N. Y., 1920); Tua v. Carriere et al., 117 U. S. 201 (1886); Butler v. Goreley, 146 U. S. 303 (1892); Central Pacific Railroad Co. v. Nevada, 162 U. S. 512 (1896); Public Service Comm. v. New York Central R. R. Co., 230 N. Y. 149, 129 N. E. 454 (1920).

## 2. *Minimum Prices to be Paid to Milk Dealers by Consumers and Others for Milk.*

It is a closer question as to whether the Milk Control Commission retains power to fix minimum prices to be paid by consumers and others to dealers for milk. The Agricultural Marketing Agreement Act of 1937, as amended, does not provide for the fixing of wholesale or retail prices for milk. The question then is whether the fixing of minimum wholesale and retail prices is so closely integrated with and a part of fixing prices to be paid producers as also to be superseded by Federal regulation. To answer that question we must consider the provisions of the Milk Control Law of April 28, 1937, P. L. 417, as amended by the Act of July 24, 1941, P. L. 443. The preamble to that act sets forth that milk is the most necessary human food and that consumers ". . . are not assured of a constant and sufficient sup-

ply of pure, wholesome milk unless the high cost of maintaining sanitary conditions of production and standards of purity is returned to the producers of milk".

Section 801 of the Milk Control Law, as amended, provides that the Milk Control Commission ". . . shall ascertain and maintain such prices for milk in the respective milk marketing areas as will be most beneficial to the public interest, best protect the milk industry of the Commonwealth and insure a sufficient quantity of pure and wholesome milk to inhabitants of the Commonwealth, having special regard to the health and welfare of children residing therein".

In fixing prices, the commission ". . . shall base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to the producer, which return shall not be less than the cost of production and a reasonable profit to the producer, and a reasonable return to the milk dealer or handler".

Section 802 provides that the commission shall fix minimum wholesale and retail prices for milk. It also provides that the commission may fix minimum prices for certain milk products and may fix maximum wholesale and retail prices for milk.

Section 803 provides that the commission shall fix ". . . the minimum prices to be paid by milk dealers or handlers to producers for milk sold or delivered or made available on consignment or otherwise by producers to dealers or handlers: . . ."

The fixing of prices to be paid by milk dealers or handlers to producers for milk to be used solely in manufacturing milk products is made discretionary with the commission.

It will thus be seen that the purpose of the Milk Control Law is primarily to assure the consuming public of sufficient milk at all times. Continuous production of

milk is to be assured by fixing minimum prices to be paid producers for milk. The fixing of minimum prices to be charged by milk dealers is necessarily dependent upon the amount to be paid producers. To the minimum price to be paid producers is to be added sufficient to pay for the cost of distributing milk and to afford a reasonable return to milk dealers. See Commonwealth v. Licini, 138 Pa. Superior Ct. 277 (1940).

In the present case, the Milk Control Commission has not found it necessary to provide as high minimum prices as the Secretary of Agriculture of the United States in order to maintain an adequate supply of pure and wholesome milk. The Secretary of Agriculture feels that higher prices are necessary. The Milk Control Commission believes that the fixing of higher prices instead of returning more to producers will cause many milk dealers to do business in such a way as to avoid paying these prices as, for example, by purchasing western cream and refusing to take milk from local producers. If the commission were to fix resale prices it would have to fix them on the minimum prices that it found necessary for producers. This would establish a lower schedule of retail and wholesale prices than will be necessary to pay producers the minimum prices fixed by the Secretary of Agriculture. In such case, orders of the commission would tend either to provide dealers with less than sufficient margin on which to operate or to interfere with the amount producers would receive. The result would be a tendency to cause lower returns to producers on some classes of milk. This would be direct interference with the authority exercised by the Secretary of Agriculture of the United States. Such interference, as pointed out above, cannot constitutionally exist. The State power must yield to the Federal power as long as the Federal power is exercised: Cloverleaf Butter Co. v. Patterson, supra.

We are not unmindful of the provisions of the Milk Control Law and the Agricultural Marketing Agreement Act, as amended, 7 U. S. C. §610(i), provides: Federal authorities.

Section 10(i) of the Agricultural Marketing Agreement Act, as amended, 7 U. S. C. §610(i), provides:

"The Secretary of Agriculture upon the request of the duly constituted authorities of any State is directed, in order to effectuate the declared policy of this chapter and in order to obtain uniformity in the formulation, administration, and enforcement of Federal and State programs relating to the regulation of the handling of agricultural commodities or products thereof, to confer with and hold joint hearings with the duly constituted authorities of any State, and is authorized to cooperate with such authorities; to accept and utilize, with the consent of the State, such State and local officers and employees as may be necessary; to avail himself of the records and facilities of such authorities; to issue orders (subject to the provisions of section 608c of this title) complementary to orders or other regulations issued by such authorities; and to make available to such State authorities the records and facilities of the Department of Agriculture: . . ."

Section 311 of the Milk Control Law, as amended, 31 PS §700j-311, provides:

"The commission is hereby vested with authority to confer with legally constituted authorities of other states and of the United States with respect to uniform milk control within the states and as between states. The commission is authorized to join with such authorities of other states and with the authorities of the United States to conduct joint investigations, to exchange information, hold joint hearings and issue joint, complementary or concurrent orders, and to enter into a compact or compacts for such uniform milk control, subject to such Federal approval as may be authorized or required by law."

These provisions indicate that if the State and Federal authorities, as the result of joint action, reach the same conclusion as to minimum prices to be paid producers, an order of the commission fixing wholesale and retail prices of milk would stand. Congress has manifested its assent to a State order fixing minimum retail and wholesale prices of milk made on the basis of the minimum prices to be paid producers determined by the Secretary of Agriculture and concurred in by the State authority. Having shown its assent to this extent, it is clear that Congress intended that Federal regulation should extend no further. The provision of section 10 (*i*) of the Agricultural Marketing Agreement Act, as amended, would have little meaning otherwise. As has been pointed out above, when Congress regulates minimum prices for milk distributed in a market, part of which is obtained through interstate commerce, the order applies to all the milk distributed in that market, whether it moves in interstate commerce or not. A concurrent State order as to minimum prices to be paid producers for milk distributed in that market would be meaningless: United States v. Rock Royal Coöperative, Inc., et al., supra; United States v. Wrightwood Dairy Co., supra. An order fixing minimum wholesale and retail prices would not be meaningless, however, but would be complementary to the Federal order.

The failure of the Milk Control Commission and the Secretary of Agriculture to arrive at the same conclusions may mean that "the hopes for a coördinated and integrated dual system would not materialize" (Buckstaff Bath House Co. v. McKinley et al., 308 U. S. 358, 364 (1939)), but it does not affect the supremacy of the Federal order over any conflicting provisions of a State order.

### 3. *Maximum Prices to be Charged Consumers and Others for Milk by Milk Dealers.*

The Milk Control Law not only provides for a constant supply of pure and wholesome milk during periods of economic stress by providing minimum prices necessary to assure constant production and distribution of milk, but also provides protection of the public against exorbitant charges by milk dealers. In fixing minimum prices, the primary consideration is what is the least cost to produce milk and get it to the consumer. In fixing maximum prices the primary consideration is whether, assuming that certain prices must be paid producers for milk and certain necessary costs exist to distribute the milk, the public is paying more than a reasonable amount for the milk. In determining maximum prices, the commission must accept the amount being paid to producers as a reasonable cost of the milk dealer's operation. It must also accept all other reasonable costs not manipulated by the dealers as necessary costs of operation.

Granting those costs, the commission must then determine whether the amount that the public is paying is so excessive over reasonable costs as to require the establishment of a ceiling on prices. This does not interfere with the administration of the Federal act. The Federal act does not touch upon maximum prices.

It has uniformly been held that where Congress has not occupied an entire field of regulation of interstate commerce, that is local in character, the States retain power to regulate the part of the field not occupied: Missouri, Kansas & Texas Railway Co. v. Haber, 169 U. S. 613 (1898) ; Reid v. Colorado, 187 U. S. 137 (1902) ; Savage v. Jones, 225 U. S. 501 (1912) ; Townsend et al. v. Yeomans et al., 301 U. S. 441 (1937) ; Kelly et al. v. Washington ex rel., 302 U. S. 1 (1937).

The minimum price established by the Federal Government must necessarily be considered by the commission in establishing maximum prices, although the commission if it were establishing minimum prices to be paid producers would not establish the same minimum price.

### 4. *Weight and Testing.*

The preamble to the Milk Control Law sets forth the fact that the utilization method of paying for milk generally prevails throughout the milk industry in Pennsylvania and makes it difficult for producers to know whether they are being paid properly for their milk. Milk. is paid for according to the weight and butterfat test of the milk.

Under article VI of the Milk Control Law, as amended, elaborate provisions are made for protecting milk producers against milk dealers who make payment on the basis of erroneous weights and butterfat tests. Milk dealers are required to obtain a permit from the commission for each place of weighing or measuring milk. The testing of milk for butterfat must be conducted by a tester certified by the Milk Control Commission. Samples taken for testing purposes must be taken by testers or weighers and samplers certified by the Milk Control Commission. The commission may decline to grant or may suspend or revoke a weighing or measuring permit, a tester's certificate, or a weighing and sampling certificate for improper sampling, weighing, or testing. The method of sampling and testing milk is set forth in detail.

Article VI of the Milk Control Law, as amended, also directs the commission to make check tests and other reasonable tests whenever in its judgment such tests are advisable for the public welfare. Milk dealers are required to furnish producers with written statements showing the amount of milk delivered daily and the

average butterfat test of the milk for the period for which payment is made.

These provisions are derived from the Act of May 6, 1925, P. L. 541, which formerly had placed these powers in the Department of Agriculture of Pennsylvania. These provisions are designed to protect milk producers against fraud, imposition, or mistake on the part of dealers in paying producers for milk. They are separable from the price-fixing provisions of the Milk Control Law and likewise are separable from the price-fixing order of the Secretary of Agriculture. The Milk Control Commission retains power to enforce article VI of the Milk Control Law, as amended, even though agents of the United States Department of Agriculture may duplicate some of the testing carried on by the Milk Control Commission: Hartford Accident & Indemnity Co. v. Illinois ex rel., 298 U. S. 155 (1936); Moulton, etc., v. Williams Fruit Corp., 218 Cal. 106, 21 P.(2d) 936 (1933).

### 5. Bonds of Milk Dealers

Article V of the Milk Control Law, as amended, requires milk dealers to file bonds with the Milk Control Commission for the protection of milk producers. Section 501 of the Milk Control Law, as amended, provides that these bonds "shall be upon a form prescribed by the commission, conditioned for the payment by the milk dealer or handler of all amounts due, including amounts due under this act and the orders of the commission, for milk purchased or otherwise acquired from producers by the milk dealer or handler during the license year, upon such terms and conditions as the commission may prescribe."

Like the weighing, sampling, and testing of milk, the bonding of milk dealers is a protection to producers of milk not necessarily related to price-fixing. While the bond protects the payment of minimum prices fixed in orders of the Milk Control Commission, the condition

is not limited to that. The bonding provisions of the Milk Control Law are broad enough to protect producers whether the price be fixed by contract between the producer and dealer, by an order of the Milk Control Commission, or by an order of another authority having jurisdiction to fix such prices. The bonding provisions of the Milk Control Law do not interfere with the powers exercised by the Secretary of Agriculture under the Agricultural Marketing Agreement Act: Hartford Accident & Indemnity Co. v. Illinois ex rel., 298 U. S. 155 (1936) ; Moulton v. Williams Fruit Corp., supra.

The bonding provisions of the Milk Control Law have been upheld as a protection against the danger of fraud to producers and consumers, as well as a reasonable provision to assure an adequate supply of pure and wholesome milk to the public: Harrisburg Dairies, Inc., v. Eisaman et al., 338 Pa. 58, 62 (1940) ; Colteryahn Sanitary Dairy et al. v. Milk Control Commission of Pennsylvania, 332 Pa. 15, 1 A.(2d) 775 (1938) ; Commonwealth v. Licini, supra. Federal price-fixing is not a substitute for the financial security provided by these bonds.

### 6. *Licensing of Milk Dealers*

Article IV of the Milk Control Law, as amended, requires milk dealers to be licensed by the Milk Control Commission. Any buying, selling, or distribution of milk in Pennsylvania, with certain limited exceptions, must be conducted by a licensed milk dealer. While some of the milk may be purchased by transactions in interstate commerce, most of the equipment of a milk dealer required to be licensed is local in character and does not involve interstate commerce. See Seelig v. Baldwin et al., 7 Fed. Supp. 776 (D. C., N. Y. (1934) ), affirmed in 293 U. S. 522 (1935).

The licensing of milk dealers engaged in interstate commerce is within the powers of a State in the ab-

sence of like regulation by Congress: California v. Thompson, 313 U. S. 109 (1941) ; Hartford Accident & Indemnity Co. v. Illinois ex rel., 298 U. S. 155 (1936).

In order to obtain a license the milk dealer must show the commission his financial condition and set forth facts that show adequate technical personnel and facilities properly to conduct the business of receiving and handling milk. The licensing of milk dealers is a protection to the public in assuring that only milk dealers able to furnish competent and adequate distribution of milk will be allowed to operate. These provisions are a protection to producers who must depend upon the milk dealers to pay them for their product and to other milk dealers who would be subject to unfair competition and ruthless trade practices by the financially irresponsible. While the Milk Control Commission will not carry on its minimum price-fixing activities in the Philadelphia markets, its other activities will be carried on.

Since the cost of administering the Milk Control Law is only partly met by license fees and the remaining cost (about 50 percent) is paid out of the General Fund, the schedule of license fees set forth in sections 408, 409, and 410 of the Milk Control Law must remain in effect: Rock v. Philadelphia et al., 328 Pa. 382 (1938), affirming 127 Pa. Superior Ct. 143 (1937).

7. *Records, Reports, Information, and Trade Practices*

Article VII of the Milk Control Law, as amended, requires milk dealers subject to license to keep full records of their activities within the Commonwealth. In addition they are required to file reports with the Milk Control Commission in order to enable the Milk Control Commission to perform its functions. These records and reports are necessary to enable the commission to check on the amounts owing producers for milk and to assure the sustained operation of the milk industry throughout the State. These records and reports while relevant to minimum prices to be paid producers or consumers are not limited to such matters.

They are relevant to determine whether the commission should fix maximum prices and whether milk dealers are engaging in such activities as the Milk Control Commission is empowered or directed to regulate. The existence of a Federal minimum price order in the Philadelphia market does not relieve the dealer operating in that market from continuing to keep the records required by the Milk Control Law and filing the reports required to be filed with the Milk Control Commission: Champlin Refining Co. v. Corporation Commission of Oklahoma et al., 286 U. S. 210 (1932); Natural Gas Pipeline Co. v. Slattery et al., 302 U. S. 300 (1937); Independent Gin & Warehouse Co. et al. v. Dunwoody et al., 40 F. (2d) 1 (C. C. A. 5, 1930).

Section 301 of the Milk Control Law, as amended, provides that the Milk Control Commission shall regulate the entire milk industry in Pennsylvania. The commission is empowered to establish reasonable trade practices, systems of production control and marketing area committees. These are matters local in nature with which the Federal Government is not concerned under its price-fixing order. You have asked whether the commission still has authority under its power to regulate the distribution, delivery, and sale of milk and the establishment of reasonable trade practices, to issue an order prescribing a bottle deposit by consumers to milk dealers to assure the return of bottles after use by the consumers. The establishment of a bottle deposit is a reasonable regulation to prevent the wanton destruction and careless loss of milk bottles. This will not interfere with prices paid for milk and is a reasonable measure for the protection of the milk industry in the Philadelphia market. It has no tendency to interfere with the Federal order. See Atchison, Topeka & Santa Fé Railway Co. v. Railroad Commission of California et al., 283 U. S. 380 (1931).

It is, therefore, our opinion and you are accordingly advised that:

1. The fixing of minimum prices to be paid producers for milk by the Secretary of Agriculture of the United States has suspended the power of the Milk Control Commission to fix minimum prices to be paid producers by dealers for milk handled in the Philadelphia Milk Marketing Area.

2. The fixing of minimum prices to be paid producers for milk by the Secretary of Agriculture of the United States has suspended the power of the Milk Control Commission to fix minimum prices to be paid by consumers and others to milk dealers for milk.

3. The order of the Secretary of Agriculture of the United States fixing minimum prices to be paid producers for milk does not prevent the exercise by the Milk Control Commission of its power to fix maximum prices to be charged consumers for milk in the Philadelphia milk marketing area.

4. The establishment of a Federal order fixing minimum prices to be paid producers for milk handled in the Philadelphia milk marketing area does not suspend the powers and duties of the Milk Control Commission to assure honest and accurate weighing, sampling, and testing of milk handled in the Philadelphia milk marketing area.

5. The establishment of a Federal order fixing minimum prices to be paid producers for milk handled in the Philadelphia milk marketing area does not relieve milk dealers of the duty of filing with the Milk Control Commission bonds for the protection of milk producers.

6. The establishment of a Federal order fixing minimum prices to be paid producers for milk handled in the Philadelphia milk marketing area does not relieve milk dealers from the necessity of obtaining licenses from the Milk Control Commission to conduct the business of selling, distributing, or manufacturing milk in the Philadelphia milk marketing area.

7. The establishment of a Federal order fixing minimum prices to be paid producers for milk handled in

the Philadelphia milk marketing area does not relieve milk dealers from keeping the records or filing with the Milk Control Commission the reports required to be filed by the Milk Control Law, as amended.

8. The establishment of a Federal order fixing minimum prices to be paid producers for milk handled in the Philadelphia milk marketing area does not take away from the Milk Control Commission its power to establish reasonable trade practices and regulate methods of distribution, delivery, and sale of milk, such as the requiring of bottle deposits to be paid by consumers to assure the return of bottles to milk dealers.